847 A.2d 1216

**Antoine Clay FAULKNER**

v.

**STATE of Maryland.**

**No. 2677, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

April 29, 2004.

618

M. Albert Figinski (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Annabelle L. Lisic (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before DAVIS, ADKINS, and CHARLES E., MOYLAN, JR., (Retired, Specially Assigned), JJ.

ADKINS, Judge.

Appellant Antoine Clay Faulkner shot and killed Quincy Powers. Faulkner claims that he "had to" because Powers was about to shoot him. In a bench trial, the Circuit Court for Baltimore County convicted Faulkner of first degree murder and committing a felony with a handgun. Faulkner now

challenges the legality of his arrest, the admissibility of his confession, and the court's rejection of his imperfect self-defense claim.

Faulkner asks us to decide what type of warrant police may use when they plan to make a home arrest in non-exigent circumstances. Specifically, he asserts that, when police enter a felony suspect's residence to execute a search warrant that does not authorize a search or seizure of the suspect himself, they may not immediately arrest the suspect, without having either an arrest warrant or exigent circumstances. We shall not reach that issue, because any illegality in Faulkner's arrest did not require exclusion of the confession that Faulkner later gave at the police station. Finding no error in the admission of that confession or the trial court's refusal to credit Faulkner's self-defense claim, we shall affirm the convictions.

## FACTS AND LEGAL PROCEEDINGS

### The Homicide And Investigation

At 11:40 a.m. on December 20, 2001, Baltimore County police received calls about "shots fired" in the vicinity of a "First Stop" convenience store. When they responded, they found Quincy Powers lying dead in the street located down the hill from the First Stop. He had been shot four times—twice in the left side of his back, once in his left thigh, and once through his right shoulder, passing into his heart.[1]

---

1. The cause of death was multiple gunshot wounds. According to the medical examiner, the shot to Powers' lateral right shoulder exited his arm and traveled into his chest, striking the superior vena cava and lodging in Power's right ventricle. The shot to his left back was an entrance wound; that bullet passed through Powers' lung and exited next to his left nipple. The shots to Powers' back in the area of the left shoulder and to the lateral area of his left thigh "did not strike vital structures." There was no soot or gunpowder stippling on the skin surface near any of the wounds, and no other evidence of close range firing. Powers had multiple abrasions on his knees, "consistent with collapse injuries."

Near Powers' body, police found one .380 caliber Remington shell casing. Police also found four of the same shell casings in the parking lot of the First Stop, near the pay phones outside the store entrance.

As part of their investigation, police took the names and addresses of people who were at the scene. One was Faulkner, who had gone home to change his clothes and hide his gun, then returned to the First Stop.

Police also interviewed witnesses in the immediate area of the shooting. Steven Douglas Larkin lived in an apartment across the street from the First Stop. His window looked out onto Radecke Avenue, where Powers was found. He told police that he heard four or five shots. He then looked out his window and saw two African American males running downhill on a dirt path that led from the First Stop toward Radecke Avenue. One tripped over his shorts or pants, falling forward in the middle of the street. When the second one caught up, the first was in a sitting position. The second man shot the victim in the back with a silver handgun that he held in his left hand.

Although both men were facing toward Larkin, he could not identify either the shooter or the victim by face because he was not wearing his glasses at the time and the shooter's hood was over his head. But he described the shooter's attire as "all in black," with a "distinctive" black fleece hooded jacket marked by a silver stripe across the back. The shooter then ran back up the hill and to the left.

Elizabeth Truesdale lived in the direction that Larkin saw the shooter run, across the street from the First Stop, on the side of the store opposite Larkin. She did not see any of the shots fired, but she and her son Barry Harris did hear three or four shots in rapid succession. She reported that, 30 to 40 seconds later, she "heard one more" shot. She went to her third floor apartment window and saw a tall black male, dressed in jeans and a black hooded velour jacket with pin stripes along the zipper, running from the First Stop past her

home, holding the bottom of his jacket or waistband, at his left hip area, with his left hand.

Two days after the shooting, police learned from Truesdale's son that a "young" friend had talked to him about the homicide. The friend told Harris that "Chew" had stopped by his home around the time of the shooting. Chew asked Harris's friend to retrieve his greenish colored lighter because he had dropped it in the First Stop parking lot. The friend told Harris that he found an orange lighter, but not a green one. Harris initially refused to identify the friend, but eventually told police that his name was "Jayrock" and showed them 5635 Utrecht Road as his address. Most importantly, Harris also identified Chew as "Antoine." He told police that Chew had been stopped by some police in front of the Woodhill Apartments, near the scene on the day of the shooting. He also pointed out 5665 Utrecht Road as Chew's home.

Police then reviewed their records, which showed that Antoine Faulkner had been stopped near the Woodhill Apartments and asked to wait there while police ran a check on him and completed a field investigation report card, which listed Faulkner's name, address, description, and clothing. They also returned to the First Stop parking lot and found pieces of a "yellowish green lighter," which had been run over or stepped on, near the pay phones where shell casings had been found on the day of the homicide. It lay beside another .380 Remington shell casing.

Police then identified and interviewed "Jayrock." They concluded that he had no information and discovered that he was incarcerated at the time of the shooting.

Having met 16 year old Maurice Jackson in the company of Barry Harris when she went to interview him, however, Detective Amy Prime investigated whether Jackson might be the "young friend" whom Harris described. On December 26, Prime took Jackson to police headquarters for questioning.

Jackson admitted that he had talked to Harris about the homicide and identified a booking photo of Faulkner as

"Chew." Jackson lived at his girlfriend's house at 5635 Utrecht Road, down the street from Chew.

Jackson told police that he had seen Chew coming around the corner of the townhouse block where both lived, from the direction of the First Stop. Chew came to Jackson's door around the time of the shooting. He was out of breath and speaking more quickly than usual. Chew asked Jackson to go to First Stop and get his green lighter. Jackson went to the store. He picked up an orange lighter, which he later disposed of. He then noticed others looking down the hill. When he went over to see what was happening, he saw Powers' body. Police were just starting to respond.

Jackson concluded that Chew either "did it" or was involved. He told Harris about the visit and the lighter while both were still at the scene, and again after they had returned to Harris and Truesdale's home.

Later that day, Jackson encountered Chew in passing and told him that the lighter was "gone." On Christmas Eve, Jackson again saw Chew. Chew told Jackson that he shot Powers, but claimed that he had no other choice because Powers kept walking toward him with his hands in his pockets, saying "what's up" in a threatening way.

Harris admitted "that he had lied about Jayrock and that Maurice Jackson was the person that told him that information."

Based on this information, on December 27, the police began surveillance of the townhouse identified by Harris and public records as the Faulkner residence. Police observed Antoine Faulkner enter, leave sometime later, walk to a nearby stream with a friend, and then return home. On the afternoon of December 27, they applied for a search warrant for the Faulkner residence.

## Warrant

The warrant affiants were Baltimore County Homicide Detective Amy Prime and Officer Ron Taylor. They sought a search warrant, but not an arrest warrant.

In the affidavit supporting the application, Prime averred that, having "attended schools on search and seizure law, interview and interrogation and homicide investigation," she was "well aware of laws pertaining to search and seizure and the Fourth Amendment." As probable cause to search Faulkner's residence for weapons, ammunition, shell casings, bloodstained clothing, and clothing matching the description of the shooter, the affiants stated:

Investigation into Mr. Powers' death revealed a witness who will testify that a black male he knows as "Chew" came to his residence on 12/20/01 and asked him to retrieve a green lighter that he had dropped at the First Stop, which is located at the crime scene.... The witness responded to the First Stop, and saw that someone had been shot. The witness saw "Chew" again on 12/23/01 or 12/24/01 at which time "Chew" told him that he had shot the boy at the First Stop. The witness identified a photograph of Antoine Clay Faulkner as "Chew".

A check with Baltimore County police records indicate[d] Deborah Yvonne Torain as the mother of Antoine Clay Faulkner. A check with a local utility company revealed 5665 Utrecht Road .... as Ms. Torain's address as of 7/6/01. Detectives requested Baltimore County Career Criminal Units to conduct surveillance on this address on 12/27/01. Detectives observed Antoine Clay Faulkner enter this residence through the rear door location and know that he is currently still inside of this address.

The requested warrant was issued at 4:23 p.m.

### Arrest And Search

At 5:40 p.m., Detective Prime and seven other officers arrived at Faulkner's residence to execute the warrant. Deborah Torain, Faulkner's mother, answered the door. Prime advised her that they had a warrant to search the house and asked her who was on the premises. She replied that her mother and Antoine Faulkner were in the residence. Prime "asked that they come and sit in the living room."

Faulkner's mother said that her son had been in the basement just before the police knocked, and "that he had gone up the stairs and said that the police were here and to tell [them] that he was not home." Detective Gary Childs, Prime's partner, went up the stairs to get Faulkner and his grandmother.

When Faulkner arrived downstairs, he was placed under arrest. At 5:45 p.m., he was taken outside and transported to police headquarters.

Prime then proceeded with the authorized search, which lasted for an hour and twenty minutes. During the search, Faulkner's mother told Prime that she knew Powers because he had lived at their house for a short while. The search yielded, *inter alia*, a pair of black sport pants with a stripe, which police later determined were designed to match a black hooded velour jacket fitting the eyewitness descriptions of the jacket worn by the killer.

### Confession

When Prime and Childs returned to police headquarters, they met with Faulkner in the homicide department's interview room, beginning at 7:51 p.m. Faulkner had been provided water and an opportunity to use the bathroom. His left hand was handcuffed to a bar attached to the wall, but the cuff was removed when the officers entered the room.

They completed a *Miranda* rights form and a basic information sheet at 7:56 p.m. Faulkner read aloud each written statement about his rights, writing yes and initialing each one in red ink as he completed it, to indicate that he understood. In that process, Prime noted that Faulkner was left-handed. At the end, Faulkner agreed to be interviewed; he signed a written statement to that effect at 8:01 p.m.

Prime asked Faulkner how he knew Quincy Powers. Faulkner said that he knew him only from going to school with him, but denied that he had ever lived at his house. The detectives told Faulkner that he was contradicting what his mother had told them. Faulkner replied that she "was a liar

and that she wasn't accurate with that." Childs called Torain, who confirmed that Powers had lived with the Faulkners. The detectives then invited Faulkner to call his mother to talk about what she had told them. At 9:08 p.m., Childs dialed the number and Faulkner spoke with his mother. He returned to the interview room at 9:20.

Faulkner also denied any involvement in the shooting. He told the detectives that he had come to the First Stop that day to buy cigarettes, but the police were already there. The detectives then told him about the eyewitness description of the killing. They also encouraged him to tell what happened so that his own family and Powers' family would know.

Faulkner continued to answer questions and talk with the detectives, though Prime felt he was "standoffish." By 11:35 p.m., they concluded that Faulkner "was only going to tell us certain things. He kept making the comment over and over, just do what you got to do. He also made a comment hypothetically, if I did do this, the only person I would have to answer to would be God." At that time, Faulkner was taken to the basement processing center. Prime began to prepare first degree murder charging documents, "so that [they] could take him for his bail hearing."

During processing, Faulkner asked Childs whether he could get the death penalty for this crime. Childs told him that "this was not a death penalty case" and mentioned a recent homicide at a local Burger King as an example of a case that would be a death penalty eligible case.

Faulkner returned with Childs from processing after a half hour, at 12:01 a.m. on December 28. Faulkner was seated on a sofa outside of Prime's office, while Prime continued to type up the charging documents. Faulkner and Childs talked about "how young kids mess up their lives, and [Faulkner] was asking questions about the Burger King Homicide," in which four young men had been arrested. Faulkner asked to see photographs from that crime scene, and Childs showed him some.

Sometime during the processing and wait for completion of the charging documents, Faulkner also asked Officer Nelson whether he could get a life sentence without the possibility of parole. Nelson responded that was a possible sentence for first degree murder.

As Prime got up to go into the hallway with the now completed charging documents, Officer Taylor told her that she "might want to try to speak with Antoine again because he was fidgety, acting a little funny." She approached Faulkner, who was standing up against the wall "ready to leave to go for his bail hearing." She gave him her business card, saying, "if you would ever like to talk to me, if you get over to the jail and you change your mind and you want to talk, you can talk to me and here is my phone number." Faulkner replied, "I want to talk to you now." The time was approximately 12:25 a.m.

Faulkner was returned to the interview room and uncuffed. He admitted shooting Powers, but said that Powers "had approached him, that he had his hand in his pocket and he kept saying, what's up, what's up, and he had no choice but to shoot him." Faulkner also told the detectives, however, that, "when Quincy Powers ran, he chased after him and shot him again." When Prime "asked why he wanted to tell us this now instead of before, . . . he said that basically he wanted to tell the truth of what happened and give his side of the story." He agreed to tape the confession, and did so, beginning at 1:19 a.m.

On the tape, Faulkner read aloud each of his *Miranda* rights and stated that he understood them. He said that he was sober, both now and on the day of the shooting. He explained that he wanted to talk with Detectives Prime and Childs in order to recount "[w]hy I had to defend myself" and "[t]o tell people the truth." He also admitted that Powers had lived at his home "two years ago." Faulkner described what happened the day of the shooting.

I went to the store to get some loose cigarettes. I got the cigarettes and as I was coming out the store I seen Quincy

Powers and he he had his hand in his pocket and he was like ... well he was like ... what's up, what's up, what's up ... real loud. I told him nothing was up and you know, he started walking toward me, and he was smoking a cigarette and he asked me for a light, so I started to back up. So, as he kept walking toward me I stopped backing up, start firing. Then he he ran down the hill I followed after him. When he fell in the street I fired one more shot and ran....

I knocked at Maurice door and.... I asked him to go get the lighter for me cause I had dropped it ... up at the store, he said yeah I'll go get the lighter.

Because Powers was approaching him with his hands in his pockets, saying "what's up" loudly, and asking for a light even though he already had a lit cigarette, Faulkner thought that "[h]e was getting ready to shoot me." But he saw no gun, either before or after he fired.

Faulkner recalled that he was wearing a "black hoodie and blue jeans and some black boots." He went home and changed his clothes, then "went back up to the crime scene." A police officer "took [his] information" at that time.

Earlier on the day of his arrest, Faulkner had seen a police helicopter, which he believed was following him. That prompted Faulkner to get rid of the gun, by taking it "down the creek" and throwing "it in the water[.]" By then, he already had "put my hoodie in a bag and put it in the trash."

When asked if there was "anything else at all that you would like to say right now[,]" Faulkner replied, "If I could take that day back I just would have ran from him. I'd a played ... I'd a played softy. I'd a ran." He added, "I'm not a killer. I was just trying to protect myself." The statement concluded at 1:36 a.m.

Prime then added information about Faulkner's confession to the charging documents and reprinted them. Faulkner was taken to the district court commissioner for his initial appearance.

## Motion To Suppress

Before trial, Faulkner moved to suppress the evidence taken in the search of his home as well as his post-arrest statements to police. During the two-day hearing on the motion, Faulkner's public defender offered four arguments in support of the motion:

• First, the warrant affidavit was so lacking in factual detail that the warrant should not have been issued. Specifically, the affidavit included inadequate information regarding Jackson's identity; his relationship to Faulkner; the circumstances surrounding Jackson's conversations with Faulkner; Jackson's credibility, both generally and with respect to his story about the green lighter and Faulkner's confession; and the circumstances in which Jackson gave police the inculpatory information. Notably, it had no information suggesting that police had corroborated Jackson's account.

• Second, the experienced police officers who applied for and executed the warrant could not possibly have had a good faith belief that it provided an adequate basis for a finding of probable cause, given the "bare bones" nature of the information regarding Jackson's reliability and the source of his information.

• Third, the home arrest was made without an arrest warrant or a valid search warrant.

• Finally, Faulkner's confession was "a product of ... *Miranda* and voluntariness violations[.]"

The court first ruled on the validity of the search warrant and the good faith exception.

My main concern in the warrant is the term witness and how that plays out. ... I don't know what to make of it. I believe that it should be further set out as to whether the witness is a confidential informant or a concerned citizen or in accordance with [*United States v. Wilhelm*, 80 F.3d 116 (4th Cir.1996)]. For that reason I'm going to find that the warrant is insufficient.

So, the next step is whether or not [*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)] and [*McDonald v. State*, 347 Md. 452, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998)] is sufficient.... [T]here is an argument by defense counsel that the detectives set out their expertise and, therefore, because they should know better, that, in effect, is bad faith. I think that means that somebody who has knowledge and a title could never make a mistake, and that if they make a mistake, then anything they do after that is in bad faith. And I really don't think that's what the case law says. I think that the Court has to look beyond the fact of their expertise.... [W]hen you first look at the warrant and you don't consider technicalities, at least my first view of the warrant was that it had probable cause. It indicates that ... the Defendant came to his residence and asked him to get a green lighter that he dropped at First Stop.

He went to First Stop and saw someone was shot, and then the Defendant told him that he had shot that boy at the First Stop. And then, of course, the Defendant was identified as that individual.

I think that is probable cause.... So, I don't think that the warrant is so lacking in probable cause that it establishes bad faith....

Therefore, based on *U.S. v. Leon* and the criteria set out in that case and *McDonald v. State* and the criteria set out in that case, I believe that the officers made a technical error, but that there is probable cause in the warrant and that they acted in good faith, that the criteria has been established to show that they acted in good faith and the warrant is saved by the good faith exception to the exclusionary rule.

The parties then addressed the legality of Faulkner's arrest and the admissibility of Faulkner's confession. The State called Detective Prime, who testified on direct about the investigation and Jackson's statement. On cross-examination, defense counsel asked Prime why she did not get an arrest

warrant or name Faulkner "as a person to be seized or searched."

Prime explained why she did not include Faulkner's arrest or Jackson's name in the warrant application:

[Detective Prime]: ... **[T]he reason that we didn't have [a name in the application] ... is because we didn't need it because it's a felony.** If we would have put his name in the warrant at the time and he was not at the location, we felt as if Maurice Jackson may be in trouble or may be in jeopardy because we hadn't recovered any handgun used in the offense as of yet.

And if by chance the Career Criminal people were wrong and [Faulkner] was not inside of that location, because it was getting dark outside, and if he would have slipped out somehow without their knowledge, then he would have had access to possibly a handgun and also a copy of the search warrant that we left at the house. If we would have put Maurice Jackson's name in, he could have been in jeopardy. . . .

[Defense Counsel]: I asked you if Antoine Faulkner was named in the warrant to be searched or seized, not Maurice Jackson. I didn't ask you—

A: No, he was not, and that's why I'm trying to explain to you. That's why; that's why I'm trying to explain to you he was not, that's why.

Q: **So, you're telling the Court that your search and seizure is for the house in which he lives about a homicide, but you don't need to name the person that you plan to arrest the minute you hit the door?**

A: **We don't do that on a regular basis. I mean, we can do that. I'm not saying it hasn't been done before, but no, we did not do that in this particular instance.** (Emphasis added.)

Defense counsel argued that "the arrest is illegal even with a felony" because "[y]ou cannot arrest someone in their home absent a warrant unless there is exigency or it's hot pursuit, and that's not the case here." But, she conceded, such a

warrantless arrest would not necessarily render Faulkner's post-arrest confession "inadmissible in and of itself," because "the issue then becomes whether or not there is probable cause for the arrest." There was no probable cause, counsel argued, because "we've got a kid saying two things without any reason why we should believe him," which was the same weakness that tainted the search warrant.

The State countered that, given the court's ruling that the search warrant was "valid based upon good faith[,]" the police were "legitimately inside the residence" and therefore needed only "probable cause to arrest" Faulkner. That was provided by Jackson's statement to police, which created "a reasonable basis" for the police "to believe that a crime ha[d] been committed and that the Defendant committed it."

The court ruled that it

was not going to get into an argument over the warrant admitting into the house or the arrest warrant because ultimately both parties agree that if there is probable cause that that ends it, and I'm going to find that there is probable cause.

My thoughts on listening to [Detective Prime's] testimony was why wasn't half of that in the warrant, and then I would never have had any problem with the warrant at all. And the reason why I think there is probable cause is, one, they have the identification of an African American male running from the scene.

That leads them to Ms. Truesdale which then leads them to Harris, who although admittedly gave them false information about who told him about Chew, but that led them to Jackson. . . .

So, there is a link here, and they discovered as a result of their conversations with . . . Harris the lighter. Now, you know, it's green, yellow green. I mean, this is probable cause. This is not reasonable doubt.

Then they talk to Jackson who says he went up there and found a yellow lighter which confirms what Harris told him.

They had found this yellowish greenish lighter. He was looking for a greenish lighter. . . .

And then he told them that Chew admitted to the shooting; he had to do it. That Chew is the one who sent him up for the lighter. We found the lighter, and they showed him a photo of Faulkner because Faulkner was stopped out in front of this area where everybody lives by the police and that was verified.

So, that's how they got the photo. . . . That would have been nice to be in the warrant.

But for probable cause here, I know all that now. And it's a nice neat connection, piece by piece puzzle that leads to Faulkner. There are some issues, obviously, and reasonable doubt about how long the lighter might have been there, if it was planted, it was broken, no fingerprints, whether Jackson is telling the truth, but at this point for probable cause, I think the police had a reasonable right to rely upon that evidence and that clearly to me is sufficient probable cause for arrest. So, the arrest is not an illegal arrest.

The last suppression issue concerned the voluntariness of Faulkner's post-arrest confession. Detective Prime testified about the *Miranda* warnings and waivers. The court found that there had been no coercion, no improper promises, and no inaccurate statements regarding possible penalties. Listing the recognized factors bearing on voluntariness of a confession, the court concluded that Faulkner "knowingly, intelligently waived and understood" his rights, and that "the confession was freely and voluntarily given[.]"

## Trial

A bench trial was held over three days. Faulkner asserted an "imperfect" self-defense claim, seeking to prove that he had the actual, if unreasonable, belief that Powers was an imminent threat and that lethal force was necessary under the circumstances.

Faulkner described Powers as his former "best friend," and as close as a "brother[.]" Before October 2000, Powers had been staying in the Faulkner home with Faulkner, his parents, grandmother, and niece, "[b]ecause he had nowhere [else] to stay" after his father kicked him out for using and selling drugs.

Eventually, Faulkner became afraid of Powers. He knew that Powers had a .38 automatic handgun. Faulkner asked his mother to tell Powers that both of them had to leave the house, apparently hoping to avoid Powers blaming him. In October, Faulkner's mother asked Powers to leave. Powers became angry at Faulkner.

Powers began calling Faulkner to tell him that he was watching him. On one occasion, he told Powers to stand at his back door, then described over the phone what Powers was wearing, even though Faulkner could not see him. On another occasion, Faulkner turned Powers away at the door, telling him that his mother allowed only one friend at a time and someone else was already there. Powers cursed and spat at the door.

After that, Powers moved out of the area, and Faulkner's family moved to another home. Although Faulkner did not see Powers, he heard that Powers had cut someone with a razor during a fight, and that he had shot at people. Faulkner got a gun because he felt "[f]rightened" that Powers "was going to hurt [him] or [his] family."

On direct examination, Faulkner testified that what he told police on the tape was true. When he made his usual morning visit to the First Stop for loose cigarettes, he had his gun "[f]or protection."

[Faulkner]: I left my house. I went to the First Stop Convenience Store. I got the cigarettes, and as I was coming, Quincy Powers he was on the phone, and our eyes locked and he dropped the phone and he went around the corner and I followed.
[Defense Counsel]: I'm sorry, you what?
A: I followed; I was going home.

Q: You followed him or you went around the corner?

A: I went around the corner. I had to go around the corner to go home. I got around the corner and he was coming back towards me. And he was like, what's up. He was saying what's up, what's up real loudly.

Q: Can you say what's up the way he did it to you?

A: What's up, what's up.

Q: How many times did he say it?

A: Four or five times.

Q: What did you do when he said what's up, what's up?

A: I told him there was nothing up and I started backing up.

Q: Why did you start backing up?

A: Because he was getting ready to try and kill me.

Q: Why did you think that?

A: Because he was saying what's up.

Q: What does what's up mean to you?

A: He was getting ready to do something.

Q: Have you ever heard anyone else say what's up . . . . [i]n that tone?

A: Yes.

Q: What happened when the other people said it in that tone?

A: They started fighting. . . .

Q: So, when someone says what's up, what's up, . . . what did you think that meant at that time?

A: He wanted to do something to me.

Q: So you started backing up?

A: Yes.

Q: And then what happened?

A: He had a cigarette in his right hand, and he switched hands with the cigarette and he put his right hand into his coat pocket like this. And I immediately did the same thing. I took my gun off safety, and he started to walk

towards me faster, and I pulled it out and started firing. I closed my eyes and when I opened my eyes he was running.

Q: Do you remember if he said anything else to you when he was walking towards you with his hand in his pocket with the cigarette?

A: He asked me for a light.

Q: What did you think when he asked you for a light.

A: He was trying to get close.

Q: Why did you think that; why didn't you think he wanted a light?

A: Because he already had a light; his cigarette was already lit.

Q: So, you took your gun out?

A: Yes, I pulled out my gun before he pulled out his gun. It was him or me. I didn't want to do it, but I had no choice. It was him or me.

Q: Then what happened?

A: I pulled out the gun and I closed my eyes and when I opened my eyes he was running.... I didn't think I hit him, so I started chasing him. He ran, I ran, and he stumbled and his right hand went back toward his coat pocket because he took his hand out when he started running. As he stumbled, he put his right hand back into his coat pocket and I fired again....

Q: Did he get all the way back up?

A: No.... He was on one knee.

Q: Where were his hands; could you see them?

A: Yeah, I remember seeing—he helped himself up and his right hand had moved back toward the pocket and I fired again....

Q: Why did you fire again at that point?

A: Because he was getting ready to grab his gun.

Q: Did you see a gun that day?

A: No.

Q: But you thought he had one?

A: Yeah, he had one.

Q: Why do you say he had one?

A: Because when you're approaching somebody and you're saying what's up, what's up like that, and you put your hand inside your coat pocket, that's indicating that you're going to come at me with something. That's what that means. I didn't want to. I should have ... started to run. I started to run.

Q: Is what you told Detective Childs true?

A: Yes.

On cross-examination, Faulkner conceded that when he saw Powers on the phone, he could have run away. Although he initially backed up when Powers approached him, he stopped backing up before he fired the first shots. Faulkner opened his eyes after shooting twice, and saw Powers running away from him. He shot at Powers' back as he was running away, at least once more. Faulkner then chased after Powers because, given that Powers was wearing two pair of pants, two sweatshirts, and a jacket, he did not know if he hit him.

With his gun drawn, Faulkner chased Powers the length of the building, down the hill on the dirt path, and into the street-a distance of approximately 85 yards. Powers' pants fell down and he fell onto his knees in the street. Powers was getting up as Faulkner reached him. Faulkner pointed the gun at Powers and pulled the trigger.

Faulkner admitted that he never saw a gun or other weapon. Although he claimed that he did not shoot Powers while he was turned away, he could not explain the medical examiner's determination that neither of Powers' frontal wounds was an entrance wound.

The trial court found Faulkner guilty of first degree murder. It rejected his imperfect self-defense claim, finding that Faulkner "became the aggressor even if he at one point was in fear." Faulkner "pursued [Powers] because he didn't think he was shooting him" with his first shots. He became the aggressor when he chased Powers, then shot Powers in the

back while he was trying to get back up. As for Faulkner's concern that Powers "was pulling a gun at that point," the court observed that, "if he had not . . . pursued him, that point never would have occurred."

Moreover, "by pursuing to shoot him again," for "85 yards or thereabouts down a hill," and shooting "a man down in the street," Faulkner "used . . . grossly excessive force and more force than would be reasonable to defend himself." Finally, the court found, Faulkner wanted to make sure "to shoot him, which leads you to premeditation."

## DISCUSSION

Faulkner raises two issues for our consideration:

I. Did the "technically defective" search warrant[,] erroneously found . . . to be "saved by the good faith exception to the exclusionary rule[,]" become the artifice for an illegal arrest of [Faulkner] within his home and taint the custodial interrogation which, in turn, led to an inadmissible recorded statement being coaxed from [Faulkner]?

II. In the non-jury trial below, did [the trial court] erroneously reject [Faulkner's] imperfect self-defense and erroneously convict [Faulkner] of first degree murder and commission of a felony with a handgun?

We answer both questions no.

## I.

### The Confession

■ Faulkner contends that his arrest and confession were tainted by the invalid search warrant because the police applied it in an improper manner to circumvent the warrant and probable cause requirements of the Fourth Amendment. In his view, the Fourth Amendment prevents police from using a search warrant as an "artifice" to make a warrantless home arrest of a suspect without exigent circumstances, and the circuit court erred in admitting his confession, which was

the "poisoned fruit" of the invalid warrant and the illegal arrest.

We need not decide whether Faulkner's arrest was illegal in order to resolve this appeal. For the reasons set forth below, we shall hold that, even if the arrest here was illegal due to the inadequacy of the particular search warrant that police used, Faulkner's confession was not subject to the exclusionary rule. In addition, we shall reject Faulkner's probable cause and voluntariness challenges.

## Standard Of Review

In considering the circuit court's denial of a motion to suppress, we are limited to the record of the suppression hearing. *See State v. Green,* 375 Md. 595, 607, 826 A.2d 486 (2003). We consider the evidence in the light most favorable to the prevailing party, in this case, the State. *See id.* We accept the suppression court's first-level factual findings unless clearly erroneous, and give due regard to the court's opportunity to assess the credibility of witnesses. *See In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998). We make our own constitutional appraisal as to whether an action taken was proper, by reviewing the law and applying it to the facts of the case. *See Green,* 375 Md. at 607, 826 A.2d 486. When the material facts are undisputed, "we are not limited to the ground of decision relied upon by the circuit court. We may base our independent constitutional review on any ground plainly appearing from the record." *Faulkner v. State,* 317 Md. 441, 447, 564 A.2d 785 (1989). *See also Fitzgerald v. State,* 153 Md.App. 601, 653, 837 A.2d 989 (2003)(appellate court's role in reviewing suppression ruling concerning warrantless activity focuses on court's decision whether to exclude challenged evidence).

## Home Arrest

Outside the home, "[a] police officer may arrest a person without a warrant if the officer has probable cause to believe that a felony has been committed or attempted and

that such person has committed or attempted to commit a felony whether or not in the officer's presence or view." Md.Code (2001), § 2–202 of the Criminal Procedure Article. Established Fourth Amendment[2] jurisprudence, however, "draw[s] a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.; see Dunnuck v. State*, 367 Md. 198, 202, 786 A.2d 695 (2001). *Payton* and its progeny teach that "the Fourth Amendment . . . prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest." *Payton*, 445 U.S. at 576, 100 S.Ct. at 1375.

▮▮▮▮ The Supreme Court has recognized that arrest warrants and search warrants safeguard two distinct privacy interests.

[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

---

**2.** The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Steagald v. U.S.*, 451 U.S. 204, 213–14, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981).

In some circumstances, this difference in protected interests is outcome-determinative. In *Steagald*, the Supreme Court held that police may not use an arrest warrant to enter a third party's home in order to find and arrest the person named in that warrant. *See id.*, 451 U.S. at 222, 101 S.Ct. at 1653. Before crossing the threshold, police must get a search warrant authorizing them to look inside that home for that suspect. *See id.* A contrary rule would effectively subject any home where a fugitive named in an arrest warrant might be located to a warrantless entry and search. *See id.*, 451 U.S. at 215–16, 101 S.Ct. at 1649. In these circumstances, therefore, an arrest warrant cannot be substituted for a search warrant because it does not protect privacy interests in the home. *See id.*, 451 U.S. 204, 213–14, 101 S.Ct. at 1648, 68 L.Ed.2d 38.

But this case differs materially from *Steagald* in that the police had a search warrant authorizing them to enter Faulkner's residence, not merely an arrest warrant for another person. As Faulkner recognizes, there is no Supreme Court or Maryland precedent specifically answering whether the police may rely on a search warrant, rather than an arrest warrant, in these circumstances.[3] We note that there are

---

3. Cases cited by Faulkner do not answer this question because they present materially different factual scenarios and legal issues. *See Groh v. Ramirez*, —— U.S. ——, 124 S.Ct. 1284, 1289–94, 157 L.Ed.2d 1068 (2004)(home entry and search based on facially invalid warrant that did not identify evidence sought); *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374–75, 63 L.Ed.2d 639 (warrantless home entry and arrest); *Kirk v. Louisiana*, 536 U.S. 635, 636, 122 S.Ct. 2458, 2458–59, 153 L.Ed.2d 599 (2002)(warrantless entry, arrest, and search); *United States v. Wilhelm*, 80 F.3d 116, 123 (4th Cir.1996)(home entry and search based on invalid search warrant on which officer could not reasonably rely); *United States v. Dequasie*, 244 F.Supp.2d 651, 658 (S.D.W.Va.2003)(home entry and search based on invalid warrants); *Dunnuck v. State*, 367 Md. 198, 210–11, 786 A.2d 695 (2001)(warrantless home entry and arrest made without exigent circumstances); *Nilson v. State*, 272 Md. 179, 190–91, 321 A.2d 301 (1974)(pre-*Payton* warrantless home entry and arrest); *Grant v. State*, 141 Md.App. 517,

many courts and legal scholars who have concluded that, "if the police have gained lawful entry to an individual's home based on a valid search warrant, they may arrest the individual before commencing the search, provided that they have probable cause to do so." *United States v. Winchenbach*, 197 F.3d 548, 554 (1st Cir.1999).[4]

---

529, 786 A.2d 34 (2001)(warrantless consensual home entry, during which exigency justifying warrantless search arose); *West v. State*, 137 Md.App. 314, 334, 768 A.2d 150 (2001)(home arrest made after entry with a search warrant, based solely on evidence found during search); *Herd v. State*, 125 Md.App. 77, 118, 724 A.2d 693 (1999)(home entry by bail bondsman); *Torres v. State*, 95 Md.App. 126, 129, 619 A.2d 566 (1993)(warrantless motel room entry and arrest); *Shuman v. State*, 83 Md.App. 319, 322, 574 A.2d 345 (1990)(warrantless search of locked guitar case in non-exigent circumstances); *Smith v. State*, 72 Md.App. 450, 464–65, 531 A.2d 302 (1987)(warrantless home entry and arrest); *South Dakota v. Belmontes*, 615 N.W.2d 634, 640 (S.D.2000)(vehicle search based on invalid "anticipatory" search warrant on which officer could not reasonably rely); *South Carolina v. Weston*, 494 S.E.2d 801, 293 (1997)(vehicle search based on invalid search warrant on which officer could not reasonably rely).

4. *Accord Jones v. City of Denver*, 854 F.2d 1206, 1209 (10th Cir.1988)(police not required to obtain arrest warrant because "officers were legally on the premises pursuant to a search warrant"); *Connecticut v. Ruth*, 181 Conn. 187, 435 A.2d 3, 6 (1980)("Once a search warrant is obtained and the entry is lawful, . . . the police are where they have a right to be and may arrest a resident, provided they have probable cause to do so"); *Illinois v. Edwards*, 144 Ill.2d 108, 161 Ill.Dec. 788, 579 N.E.2d 336, 343 (1991)(when police enter home to execute search warrant, they may arrest resident if they have probable cause); *Kansas v. Dye*, 250 Kan. 287, 826 P.2d 500, 507 (1992)(same); *Minnesota v. Galde*, 306 N.W.2d 141, 143 (Minn.1981)(same); *Nebraska v. Ware*, 219 Neb. 594, 365 N.W.2d 418, 421 (1985)(same); *Ludwig v. Nevada*, 97 Nev. 445, 634 P.2d 664, 665 (1981)(same); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 6.1(c)(3d ed. 1996 & Supp.2004)("a warrantless arrest within premises is permissible when the prior entry was gained by executing a search warrant for physical evidence"). Most concur with the reasoning of the 10th Circuit, that

[a] search warrant represents a judicial determination that there is probable cause to invade the privacy of the suspect's home. The impartial determination that supports the issuance of a *search* warrant justifies a greater intrusion than that supporting the issuance of an arrest warrant. Thus, once an officer has procured a *search* warrant, the privacy interests that led to the imposition of an *arrest* warrant requirement in *Payton* have been protected.

*Jones*, 854 F.2d at 1209. "From a Fourth Amendment standpoint," these courts and scholars agree that a warrantless arrest in the home

To resolve Faulkner's appeal, however, we need not decide whether the police were obligated to obtain an arrest warrant or a search warrant naming him. Even if we assume for purposes of argument that the failure to obtain such a warrant made Faulkner's home arrest illegal, nevertheless we reject Faulkner's contention that the circuit court erred in refusing to exclude his confession. Applying limits on the scope of the exclusionary rule in accordance with *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), we conclude that the court correctly held that Faulkner's confession was not inadmissible "fruit of the poisonous tree."

## A.

### Admissibility Of Confession Made After Illegal Arrest

 The exclusionary rule extends to evidence "acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint[.]'" *Murray v. United States,* 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472 (1988). It "is not intended to put the police in a worse position than they would have occupied had the alleged violation of the accused's rights not occurred." *Tu v. State,* 336 Md. 406, 429 n. 8, 648 A.2d 993 (1994).

 The Supreme Court held in *Harris* that the exclusionary rule does not "grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 1643, 109 L.Ed.2d 13 (1990). The purpose of the rule is fully served by excluding statements made immediately after an unlawful warrantless home arrest, while the arrestee remains in the home. *See id.,* 495 U.S. at 20, 110 S.Ct. at 1644. If police have probable cause to arrest before they committed a

---

when the police have entered to execute a search warrant " 'is no more objectionable than a warrantless arrest on the street.' " *Winchenbach,* 197 F.3d at 554 (quoting LaFave, *supra,* § 6.1(b), at 236 n. 56).

*Payton* violation, then the exclusionary rule may not bar the use of statements made by the arrestee later at police headquarters. *See id.,* 495 U.S. at 18, 110 S.Ct. at 1643.

In *Harris,* police made a nonconsensual and warrantless home arrest. While they were still in Harris' home, Harris confessed to murder. Later, at the police station, Harris made a second statement confessing to the murder. The confession obtained while Harris was still inside his home was inadmissible due to the *Payton* violation. But Harris' second confession at police headquarters was admissible because he was lawfully in police custody, given that police had probable cause to arrest him before they entered his home. *See id.,* 495 U.S. at 19, 110 S.Ct. at 1644.

In *Torres v. State,* 95 Md.App. 126, 619 A.2d 566 (1993), we applied the lessons of *Harris* in another case similar to this one. Although police made an illegal warrantless "home" arrest in a motel room, we held that Torres' confession was not subject to the exclusionary rule because police had probable cause for the arrest before they entered the room and his confession had been voluntarily given at the police station. *See id.* at 131–32, 619 A.2d 566.

Emphasizing that "the rule in *Payton* was designed to protect the physical integrity of the home[,]" Judge Moylan explained the practical logic underlying this limitation on the scope of the exclusionary rule.

> The reason for not applying the "fruit of the poisonous tree" doctrine is that there is a clean break in the chain of cause and effect. The same probable cause, here indisputably present, that could have justified the issuance of an arrest warrant but would not justify a warrantless arrest inside a home would justify a warrantless arrest upon the street. An unlawful arrest of a suspect under *Payton v. New York* does not confer upon the suspect immunity from subsequent lawful arrest. Once the suspect is outside the protected premises, therefore, the initially invalid restraint ripens into valid restraint. . . .

A constitutionally supervening lawful restraint upon the street, be it in the form of a fresh arrest or be it in the form of an initially flawed arrest ripening into a valid one, effectively sanitizes everything that follows from any earlier contagion from a *Payton* violation. The effect (the confession) is no longer the product of the initial cause (the unlawful arrest in a residence) but is rather the product of the supervening cause (the lawful arrest upon the street).

*Id.* at 131–32, 619 A.2d 566. *See also Brown v. State,* 124 Md.App. 183, 199–200, 720 A.2d 1270 (1998), *cert. denied,* 353 Md. 269, 725 A.2d 1067 (1999)(statement made at police station need not be excluded as a result of illegal five minute detention after *Terry* frisk, because police already had arrest warrant based on probable cause before the illegal detention); *Smith v. State,* 72 Md.App. 450, 469, 531 A.2d 302 (1987)(fact that warrantless home arrest was illegal did "not automatically or even necessarily require suppression of . . . statement" made at police station). *Cf. Miles v. State,* 365 Md. 488, 539, 781 A.2d 787 (2001)("trial judge properly drew the line between the taint of the original illegality" from unauthorized wiretap, in finding "attenuation from the taint").

As in *Harris* and *Torres,* the confession in this case occurred after the allegedly illegal home arrest, while Faulkner was at the police station. Although the suppression court and counsel did not explicitly cite the attenuation principles of *Harris* and *Torres,* the record shows mutual understanding that these scope limits on the exclusionary rule apply here. As the public defender correctly acknowledged, any illegality in Faulkner's warrantless arrest did not make the confession "inadmissible in and of itself" because the exclusionary rule does not apply to Faulkner's confession if police otherwise had probable cause for his arrest and the statement was voluntary.

We are not persuaded that a different result is required by the Supreme Court's recent decision in *Kaupp v. Texas,* 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), cited by Faulkner as an example of a police station confession that was tainted by an illegal warrantless home arrest. Seventeen year old Kaupp was seized without a warrant at 3 a.m., while he

was sleeping in his bed. At that time, police did not have probable cause to arrest Kaupp. Clad only in underwear on a January night, he was taken to the crime scene and then to the police station for questioning. No "substantial time passed between Kaupp's removal from his home in handcuffs and his confession after only 10 to 15 minutes of interrogation." *Id.* at 1848. The Supreme Court held that the State had failed to meet its burden of showing that the confession was an act of free will that " 'purge[d] the primary taint of the unlawful invasion.' " *Id.* at 1847 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)). In our view, the egregious and different conditions in which Kaupp confessed only underscore the attenuation between Faulkner's arrest and his confession. As we discuss below, there was probable cause for Faulkner's arrest and his confession was voluntarily given at the police station in circumstances that dispositively distinguish this case from *Kaupp.*

## B.

### Probable Cause

Faulkner primarily challenges the court's finding of probable cause by relying on the inadequacy of the warrant affidavit. But, in contrast to the court's task in determining whether there was probable cause to issue the warrant, the court's task in determining whether there was probable cause to make an arrest can be accomplished with evidence outside that affidavit. To the extent that Faulkner's challenge also contests the court's finding of probable cause based on such information, we reject it.

A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. Probable cause exists where the facts and

circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested. Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. *Collins v. State,* 322 Md. 675, 679, 589 A.2d 479 (1991) (citations omitted).

In determining that the police had probable cause to arrest Faulkner, the circuit court was not confined to the meager information presented in support of the warrant application. We agree with the circuit court that, despite the "bare bones" nature of the warrant affidavit, and uncertainties regarding the reliability of Jackson's story, police had ample evidence to establish probable cause that Faulkner shot Powers. As the court pointed out, the investigation quickly developed information leading them directly to Faulkner, including information obtained from Larkin, who saw the shooting and described the shooter as a left-handed black male who was shorter than Powers; from Truesdale, who heard the shots and led police to her son, Harris; from Harris, who identified Faulkner as the possible shooter and led police to both the green lighter and Jackson; and, ultimately, from Jackson, who "connected all the dots" with his account of Faulkner's request to retrieve the green lighter and Faulkner's confession. These accounts had been corroborated by evidence recovered at the crime scene, including Powers' body, the lighter, and the shell casings. We therefore find no error in the court's conclusion that police had probable cause to arrest Faulkner before they arrived at his home.

## C.

### Voluntariness

■ Faulkner points to certain evidence that, he asserts, calls into question the voluntariness of his confession. Specifically, he complains that he did not understand the *Miranda* warnings and that he was interrogated at length before being

taken to the commissioner, during which time officers used "pressure tactics" such as showing him crime scene photos from the Burger King case. We find no merit in these complaints.

## 1.

### *Miranda* Waivers

The court found, as a matter of fact, that Faulkner understood and twice waived his *Miranda* rights. We review that finding for clear error. *See Williams v. State,* 127 Md.App. 208, 211, 732 A.2d 376, *cert. denied,* 356 Md. 179, 738 A.2d 855 (1999). In doing so, we accept the court's determination that Faulkner's belated claim that he was intoxicated when he confessed was not credible. *See id.* Because there is substantial evidence in the record to support the conclusion that Faulkner was sober, and that he understood and waived his *Miranda* rights, we affirm those findings.

In fact, this is precisely the type of evidentiary record that shows adequate advisement and, in doing so, facilitates judicial review. Faulkner voluntarily read each clearly stated right aloud, to the two detectives who were planning to talk with him. He was given an opportunity to ask questions, but had none. He assured the detectives orally and in writing that he was sober and that he understood each right, and then placed the word "yes" and his initials next to the statement of each individual right, in a different color of ink than that used by the detectives, in order to indicate his understanding.

At the beginning of his taped statement, Faulkner orally acknowledged the thorough *Miranda* review and waiver that took place before his first interview. In that process, the same item-by-item advisement of *Miranda* rights was repeated, just before Faulkner recorded his confession. On the audiotape, Faulkner stated that he had not asked for a lawyer, that he spoke with police voluntarily, and that he was not promised anything to do so. We commend the manner in which Faulkner's *Miranda* rights were reviewed and his waivers were recorded.

■

## 2.

### Delay In Presentment

■ Faulkner cites *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003), as additional grounds for a new trial. Pointing out that he was not presented to a commissioner for his initial appearance until seven and a half hours after his arrest, Faulkner claims that "[w]e are left to wonder whether a prompt presentment to a detached magistrate would have chilled the inquisition." He suggests that *"Williams,* thoughtfully construed, would call for consideration of such issues on remand." We again disagree.

■ The constitutional test of voluntariness is whether, given the totality of the circumstances from the time of the arrest through the time of the confession, the accused's statement was the product of physical or psychological coercion that succeeds in overbearing the accused's will to resist. *See Hof v. State,* 337 Md. 581, 595–96, 655 A.2d 370 (1995). To assess the voluntariness of a particular confession, all circumstances relevant to the detention, interrogation, and confession must be considered. *See id.* Although there is no definitive list of relevant circumstances, the Court of Appeals has recognized that consideration should be given to a wide range of factors, including

> where the interrogation was conducted; its length; who was present; how it was conducted; whether the defendant was given Miranda warnings; the mental and physical condition of the defendant; the age, background, experience, education, character, and intelligence of the defendant; **when the defendant was taken before a court commissioner following arrest;** and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Id.* at 596–97, 655 A.2d 370 (citations omitted and emphasis added).

■ "[T]he purpose of prompt presentment is to provide a defendant with a full panoply of safeguards." *Facon v. State,*

375 Md. 435, 447, 825 A.2d 1096 (2003). The Court of Appeals has recognized that

> [p]resentment ... serves four vital functions: the determination of whether sufficient probable cause exists for continued detention; determination of eligibility for pre-trial release; informing the accused of the charges against him, his right to counsel, and, if indigent, his right to appointed counsel; and, if the charge is beyond the jurisdiction of the District Court, his right to a preliminary hearing.

*Williams,* 375 Md. at 418, 825 A.2d 1078.

Md. Rule 4–212(e) reduces the risk that a confession will be coerced during a custodial interrogation conducted before the accused is advised of his rights by a district court commissioner. By that rule, the Court of Appeals has directed that

> [a] copy of the warrant and charging documents shall be served on the defendant promptly after the arrest. The defendant shall be taken before a judicial officer of the District Court **without unnecessary delay and in no event later than 24 hours after arrest[.]** (Emphasis added.)

In *Williams,* the Court of Appeals examined a 47 hour delay in presentment for the improper purpose of eliciting confessions from a nineteen year old murder suspect. Williams was arrested as a suspect in a robbery. He used his brother's name, but was carrying a paycheck with his name. Prince George's County robbery detectives questioned Williams "to get some basic information about [this] suspect and even about his involvement in the two robberies." *Id.* at 423, 825 A.2d 1078. While they were questioning Williams, they confirmed his identity and discovered that he was the subject of three arrest warrants for homicide. Williams confessed to two robberies and gave two written statements about them, within four hours of his arrival at the police station. The Court of Appeals concluded that, at this point,

> the police had all of the basic information they needed to present [Williams] to a Commissioner. They knew who he was and had solid grounds upon which to charge him with two armed robberies. They could have taken him to a Commissioner and then returned him to the station for

questioning as to the homicides. Instead, ... he was turned over to the homicide unit for interrogation as to a wholly different set of crimes.

*See id.* at 423–24, 825 A.2d 1078.

The Court unanimously held that Williams' robbery confessions were voluntary and admissible, but that his later murder confessions were involuntary and inadmissible, due to the lengthy interrogation and unnecessary delay in presentment. *See id.* at 423, 825 A.2d 1078. The premise underlying the Court's decision in *Williams,* and in its two other decisions issued that day, is that police may not deliberately delay presentment in order to extract a confession before a suspect has an in-court opportunity to be advised of, and to assert, his constitutional rights. *See id.* at 424, 825 A.2d 1078; *Hiligh v. State,* 375 Md. 456, 474–75, 825 A.2d 1108 (2003)(presentment delay of nearly 24 hours); *Facon v. State,* 375 Md. 435, 453, 825 A.2d 1096 (2003)(presentment delay of 12 hours after arrival in Maryland plus 24 hours between arrest in D.C. and extradition); *see also Perez v. State,* 155 Md.App. 1, 20–21, 841 A.2d 372 (2004)(presentment delay of 48 hours).

Nevertheless, we do not read *Williams* as a blanket instruction to grant new trials whenever the police interview a suspect before presentment. Neither *Williams, Hiligh, Facon,* nor our recent decisions in *Perez* and *Odum v. State,* 156 Md.App. 184, 846 A.2d 445 (2004), sweeps so broadly.

First, we see nothing in *Williams* or these other cases to suggest that police are required to ignore a suspect's request to explain what happened while authorities are still deciding whether to charge him with murder. To the contrary, the *Williams* Court recognized, with respect to the initial interrogation concerning the robbery for which Williams had been arrested, that some reasonable and necessary delay may result from police questioning designed to determine whether to charge the suspect, and for what crime. The *Williams* Court explained why such delay does not violate the prompt presentment rule.

[Williams] was not effectively available for questioning until he arrived at the police station at about 9:25 a.m. on July 30.

It was entirely appropriate at that point for the police to engage in preliminary questioning, to get some basic information about their suspect and even about his involvement in the two robberies, so that he could be properly identified and charged.

That questioning began within ten minutes and promptly produced oral confessions to the two robberies. It was not then inappropriate for the police to seek a written statement, to confirm the oral admissions, which they also did promptly. The first written statement was begun at 10:35, within ten minutes after the interrogation began, and was completed by 11:13. Only then did Detective Thrift discover the likelihood that petitioner was not who he said he was—Allan Williams—but was, in fact, Reccardo Williams, someone, he learned, who was suspected in three homicides. Especially in light of petitioner's oral confession to the second robbery, some further questioning was not inappropriate. The second statement was begun at 11:40 and was completed by 12:42.

*Williams*, 375 Md. at 423, 825 A.2d 1078.

 Moreover, delaying presentment in order to question the suspect may be particularly appropriate when, as in this case, the police have received information suggesting that there may have been a self-defense justification for the shooting. Jackson had advised police about Faulkner's claim that "it was him or me." Faulkner did not complete his initial *Miranda* advisements until 8:01 p.m. The questioning concluded three and a half hours later, at 11:35 p.m. Faulkner remained willing to speak with detectives throughout the interview, and even after they decided to end it. There was no threat of continued interrogation, once it became clear that Faulkner was not going to admit any involvement in the shooting, much less relate any information bearing upon whether there had been a need for self-defense. At that point, as Faulkner knew, police began to prepare the documents necessary to charge him with murder and to take him to the commissioner.

As the *Williams* Court recognized, the detectives were entitled to question Faulkner about his involvement in the crime for which he had been arrested, in an effort to determine whether he had information bearing on their decision to charge him, if Faulkner was willing to talk to them. Notably, Faulkner did not lodge any complaint about the course or the results of that interrogation. Unlike Williams, Hiligh, Facon, and Perez, Faulkner did not dispute the substance of his confession. Nor did he allege that it was extracted through physical coercion. And, unlike those confessions, Faulkner's was given after police voluntarily ended the interview, while the charging papers were being prepared. Faulkner apparently would have been presented to the commissioner before he confessed if he had not asked to "talk ... now" with the detectives who were just about to take him there.

Thus, much of the total time between arrest and presentment was consumed by legitimate investigative and administrative tasks that the Court of Appeals has explicitly approved as "necessary." *See Williams,* 375 Md. at 423, 825 A.2d 1078; *Hof,* 337 Md. at 596–97, 655 A.2d 370. The interval between Faulkner's arrest and his presentment reflected reasonable and necessary delay for further investigation (via the search of Faulkner's home and questioning him) regarding his involvement and degree of culpability, before charging papers were drawn up, as well as reasonable and necessary delay for administrative procedures (*i.e.,* "processing" and preparing the charging papers). We hold that the delay in presentment concerns addressed in *Williams* do not warrant a new trial in Faulkner's case.

### E.

### Conclusion

Faulkner's appeal of the court's suppression decision challenges only the admissibility of his confession.[5] We hold that

---

5. Faulkner has not relied on the items recovered in the search as grounds for reversal. We note that the trial court stated in its bench verdict that those items were not a factor in its decision.

any failure by the police in obtaining a valid and appropriate warrant does not require exclusion of Faulkner's confession. Because police had probable cause to arrest Faulkner before they entered his home, and Faulkner made a voluntary confession at the police station, the exclusionary rule does not apply. Accordingly, we find no error in the circuit court's decision to admit Faulkner's confession.

## II.

### Imperfect Self-defense

 Faulkner complains that the trial court committed clear factual error in rejecting his claim of imperfect self-defense.[6] Specifically, Faulkner points to the following description, in the bench ruling, of the encounter that led to the shooting:

> Quincy Powers apparently saw Faulkner and Quincy Powers **walked away around the corner and Faulkner followed him.**

> When Quincy Powers stopped, then Faulkner became afraid for the reasons he testified to.... (Emphasis added.)

In Faulkner's view, the highlighted statement was "verbal error" because "there was **no** evidence of the victim's initial walking away[.]" That "misstatement fouled [the court's]

---

**6.** The prospect of "imperfect" self-defense arises when the actual, subjective belief on the part of the accused that he/she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both.... Imperfect self-defense ... requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so." ... Unlike its "perfect" cousin, "imperfect" self-defense, if credited, does not result in an acquittal, but merely serves to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter.
*State v. Marr*, 362 Md. 467, 473–74, 765 A.2d 645 (2001) (citations omitted); *see State v. Smullen*, 2003, 380 Md. 233, 844 A.2d 429 (2004); *State v. Faulkner*, 301 Md. 482, 486, 483 A.2d 759 (1984).

conclusion" that Faulkner committed first degree murder, by skewing the court's "view of the initial contact."

We agree with the State that there was neither factual error in the court's finding of what happened, nor any prejudice. The court's description of how the encounter began accurately recounts Faulkner's own testimony that Powers "went around the corner and I followed" in order to return home, which was in that same direction. Faulkner mischaracterizes the court's statement as one that "surely suggest[s]" that Powers was retreating when Faulkner followed Powers in order to pick a fight. Read in the context of the court's entire ruling, this was merely the court's explanation of the routes taken by Powers and Faulkner, not a conclusion that Faulkner harbored a nefarious motive for "following" Powers around the corner toward the path home.

To the contrary, the court explicitly found that, after Faulkner arrived around the corner, Powers advanced toward Faulkner, putting Faulkner in fear. At that point in time, the court recognized, Faulkner had the state of mind necessary to establish imperfect self-defense. Ultimately, however, the court made it clear that its decision to convict Faulkner of first degree murder was not based on what happened in the First Stop parking lot. Instead, the court held that, even if Faulkner had not been the initial aggressor, and even if he had been in fear while he was in the parking lot, he eventually became the aggressor, by chasing after Powers to shoot him, and by choosing "grossly excessive" lethal force while Powers was "down in the street."

For that reason, we find no error in the court's rejection of Faulkner's imperfect self-defense to the first degree murder charge. Because the doctrine of imperfect self-defense is not available as a defense to charges of committing a felony with a handgun, we also conclude that the court did not err in rejecting it with respect to that offense. *See Watkins v. State,* 328 Md. 95, 106 & n. 3, 613 A.2d 379 (1992).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**