*State of Maryland v. Jermaine Cordell Lewis*, No. 1695, September 2022 Term. Opinion by Moylan, J.

**HEADNOTE:**

**ANATOMY OF A DYING EMBER – AN UNSOLVED CASE FROM 2005 – THE SEPARATE DYING EMBER: JAILHOUSE INFORMANT RAYMOND DARBY – AN ANALYSIS DEFERRED – THE INVESTIGATION RESUMES – A SIX-YEAR WILD GOOSE CHASE – APPLICATION FOR A STATEMENT OF CHARGES – THE SOLE ISSUE BEFORE US: JUDGE ANDERSON'S RULING OF AUGUST 4, 2022 – A DOUBLE-BARRELED RULING – STANDARD OF APPELLATE REVIEW – A NON-CONTENTIOUS CONTENTION – BUT A CONTENTIOUS NON-CONTENTION – A BAD FAITH INVOCATION OF THE GOOD FAITH EXCEPTION – THE COLLECTIVE KNOWLEDGE RULE – THE DARBY FRAGMENT – CREDIBILITY AND RELIABILITY – A. DARBY WAS A JAILHOUSE INFORMANT – B. DARBY MAY WELL HAVE BEEN AN ACCOMPLICE – C. DARBY'S MEMORY WAS SUSPICIOUSLY PRECISE – D. A RECOLLECTION OF A RECOLLECTION: ATTENUATION <u>PER SE</u> – E. THE POLICE DID NOT CREDIT THE DARBY FRAGMENT – F. JUDGE ANDERSON DID NOT CREDIT THE DARBY FRAGMENT – THE INCULPATORY SIGNIFICANCE OF THE DARBY FRAGMENT: THE INTRACTABLE AMBIGUITY OF THE PRONOUN "THEY" – WHERE ARE WE? – A DEAD EMBER**

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1695

September Term, 2022

_____

STATE OF MARYLAND

V.

JERMAINE CORDELL LEWIS

_____

Berger,
Beachley,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: December 5, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

Ah, distinctly I remember,
It was in the bleak December,
And each separate dying ember,
Wrought its ghost upon the floor.

…Edgar Allan Poe, "The Raven" (1845)

**Anatomy Of A Dying Ember**

This is a cold case. A very cold case. This appeal by the State from an adverse pre-trial suppression ruling in 2022 raises an intriguing question: Could some vestigial spark from what had been no more than a dying ember in 2008 actually resuscitate a criminal case that had apparently turned cold 17 years before that 2022 suppression ruling?

The appellant, the State of Maryland, argues that a dying ember from 2008 had, indeed, retained enough of a spark that it could, without more, have theoretically justified the warrantless arrest of the appellee, Jermaine Cordell Lewis, on January 17, 2018, ten years after the ember was discovered. The appellee stoutly maintains to the contrary that his arrest on January 17, 2018 was without a shred of constitutional justification, particularly from an ember that had long since been totally extinguished. From 2022, both sides were actively looking back to 2008.

The appeal is from the August 4, 2022 ruling by Judge Tiffany H. Anderson in the Circuit Court for Prince George's County that a post-arrest statement to the police by the appellee in 2018 would be suppressed on the ground that his 2018 arrest had been an unconstitutional violation of the Fourth Amendment. The arrest had been made on the basis of a clearly bad warrant. The State maintains that, despite the bad warrant, the ember from 2008 had nevertheless re-infused the 2018 arrest with vital constitutionality. Our analysis

will entail conducting a minute and granular anatomy of that dying ember from 2008. What ghost had it wrought upon the investigation and did that ghost still retain any probative vitality in 2022? We must stir the ashes.

## An Unsolved Case From 2005

On February 16, 2005, at shortly before 3 P.M., a murder was committed at a townhouse at 6534 Columbia Terrace in Landover, Prince George's County. At least two men, and quite possibly a third, entered the townhouse armed with a handgun. The intruders tied Nathaniel Eugene Rozier's hands behind his back and locked him in a downstairs bathroom. The intruders then proceeded upstairs. Kerry Antonio Bennett, who was upstairs in his bedroom, fought with the intruders as they attempted to search his room. In that struggle, Bennett was stabbed and then shot. The intruders fled the house. When the police arrived at the scene, they found Bennett suffering from apparent gunshot wounds. They transported him to a local hospital where he later died from his injuries. The official cause of death was given as gunshot wounds and multiple sharp force injuries, to wit, shooting and stabbing. The manner of death was ruled to have been a homicide.

At the crime scene, there was no physical or scientific evidence linking anyone to the perpetration of the crime. There were no video camera recordings, no fingerprints, no bloodstains, and no DNA. The only source of information about the crime was the recollection of the lone survivor, Nathaniel Rozier. At that point in 2005, Rozier could not identify anyone. Rozier told the police that he did not see the faces of either (or any) of the suspects. He could only describe their clothing. When Rozier was asked, "Can you identify either suspect?," he responded, "Possibly suspect number one." He further indicated that it

was suspect number one who had a gun. When Rozier was interviewed in the immediate aftermath of the crime, he had apparently told the police that there had been two intruders. When reinterviewed by Detective Jeffrey Eckrich in 2016, however, Rozier clearly stated that there had been three intruders, not merely two.

That was the sum total of the evidence the police had to go on. When Bennett was pronounced dead by Dr. Casiburg at the hospital at 3:41 A.M. on February 17, 2005, this investigative file was effectively closed. The murder of Kerry Bennett had become a cold case within 12 hours of its commission. It remained glacially cold for the next three and one-half years.

### The Separate Dying Ember: Jailhouse Informant Raymond Darby

What happened to warm the case up three and one-half years later? It would be kind to say that the police discovered a dying ember from the case in 2008. It would be more accurate to say, however, that the dying ember discovered the police in 2008.

In March of 2008, Raymond Darby was an inmate in a federal detention facility in Virginia. Of his own initiative, he sent word to the Prince George's County Police that he had information to trade that would be of interest to them. Detective Matthew Barba, a homicide detective with the Prince George's County Police, went to Virginia to interview Darby in March of 2008. Detective Barba's interview with Darby is our separate dying ember. It is the sine qua non of the State appeal now before us.

Darby told Detective Barba that on the afternoon of February 16, 2005, three years earlier, he spoke with one Anthony Forte and with the appellee, Jermaine Cordell Lewis,

3

at the home of Lewis's girlfriend and future wife. The story Darby provided to Detective Barba narrated in vivid and painstakingly accurate detail the actus reus of the murder scene from 2005. The spark that gave critical life to the ember, however, was the culmination of Darby's statement to Detective Barba: "…they admitted their involvement…" That was the incendiary core of the lone ember in this case: "**THEY ADMITTED THEIR INVOLVEMENT**." Significantly, however, the appellee Lewis was not arrested at that time nor was he arrested for the next ten years.

What the Darby information gave the police, of course, was, if nothing else, a legitimate lead for further investigation. With the names of Forte and Lewis to work with, the police were now able to reinterview the surviving victim of the crime, Nathaniel Rozier, and to show him photographs of those two now named suspects. That reinterview took place on August 8, 2008. At the photo array conducted that day, Rozier identified a photograph of Forte.[1] He could not, however, identify anyone else. In short, Rozier failed to identify Lewis. With that, the case again went cold. It remained cold for another eight years.

### An Analysis Deferred

At this point we could engage in an analysis of that information supplied by the informant Raymond Darby in 2008. We would find that ember to be terminally cold in two regards. The first fatal flaw would be that Darby and, therefore, the Darby information was

---

[1]    As massive as the record is in this case, it neglects to tell us what, if anything, ever happened to the potential criminal case against Anthony Forte.

4

fundamentally unreliable. The second fatal flaw would be that, any issue of credibility or reliability aside, the Darby information was substantively of scant inculpatory weight.

Rather than engage in that analysis now, however, it will be more convenient and our narrative will make far more sense if we defer that final analysis of the Darby information for the nonce and go forward with the subsequent procedural history of the case.

## The Investigation Resumes

What next happened in 2016, eleven years after the perpetration of the crime and eight years after the addition of the Darby statement, was that Detective Jeffrey Eckrich, a member of Prince George's County Police Department's cold case unit, was assigned to the case and a new chapter unfolded. Although the earlier reinterview and photographic array with the victim Rozier in 2008 had been completely unproductive, Detective Eckrich decided to interview Rozier yet again and he did so on March 10, 2016, after eight years of inactivity.

## A Six-Year Wild Goose Chase

That reinterview of Rozier and especially the photo array session that was its central purpose turned out to be calamitous. It sent the dormant case off on a six-year wild goose chase that took flight on March 10, 2016 and was not brought to ground until Judge Anderson granted the appellee's motion to suppress a statement on August 4, 2022. For that entire six year period what turned out to have been a patently false identification (or a patently inaccurate recollection of a non-identification) took on a life, and flight path, of its own.

5

It was with respect to the appellee Lewis specifically that the reinterview and new photo array turned chaotic. It is now clear that with respect to Lewis, the new photo array was completely unproductive. It was an apparent misreading of what occurred on March 10, 2016, by Detective Eckrich that sent the wild goose aloft.

We now know that on March 10, 2016, the appellee Lewis was never identified by Rozier. In the confusing muddle of the photographic array session, two parts of which Detective Eckrich apparently failed to keep distinct were Exhibit #6, a photographic composite that was never viewed by Rozier, and Photograph #6 of Exhibit 5, which very definitely was viewed by Rozier. Photograph #6 versus Exhibit #6. That was inevitable confusion waiting to happen.

Exhibit #6, which never became part of the later analysis, was an array of six persons, one of whom was, indeed, Lewis. His photo was the middle photo on the top row. There is no indication that Exhibit 6, however, was ever viewed by Rozier. It is now fully agreed by all parties that Lewis was never identified.

Exhibit 5, by contrast, was very definitely viewed by Rozier. It was a black and white composite of six photographs of six suspect persons. None of those photographs, however, was of Lewis. On Exhibit 5, Rozier very definitely identified Photo 6, in the lower right hand corner. It is again unanimously agreed by all parties that Photo 6 of Exhibit 5 was not a photo of the appellant Lewis. Rozier placed a circle around Photo 6 and wrote on the photo the initials NER, for Nathaniel Eugene Rozier. Introduced into evidence were the notes that Detective Eckrich made at the time of the reinterview. Those notes included:

6

SHowed [sic] Rozier photo spread. <u>Rozier identified photo #6 – bottom right picture of Jermaine Lewis</u>.

(Emphasis supplied.) With that confused and mistaken recollection by Detective Eckrich of what had actually happened at the photo array, the wild goose was in the air.

## Application For A Statement Of Charges

A blatant police error had been made and that mistake dominated the rest of the reopened investigation for the next six years. With respect to what happened to the case over the course of the next year and nine months the record leaves us largely in the dark. On December 28, 2017, however, it was Detective Eckrich who applied for a Statement of Charges against Lewis. The prominent centerpiece of that application for a Statement of Charges was his core allegation:

> <u>During the course of the investigation, the Defendant, Jermaine Cordell Lewis</u> (B/M DOB:[]) [sic] <u>was developed as a suspect</u>. On 3/10/2016, a photo spread containing a picture of Jermaine Cordell Lewis was shown to Victim Rozier. <u>Victim Rozier positively identified Jermaine Cordell Lewis as one of the suspects that tied him up and killed victim Bennett</u>.

(Emphasis supplied.) In his recollection, Detective Eckrich had apparently confused Photo #6, which was not Lewis, with Exhibit #6, which was Lewis.

Based entirely on that mistaken allegation by Detective Eckrich, a Statement of Charges against Lewis was issued by Commissioner Redmond on December 28, 2017. On that Statement of Charges, the appellee Lewis was arrested on January 17, 2018. Questioned by the police following his arrest, Lewis gave a statement in which he staunchly denied any involvement in the killing of Bennett but did admit that he had entered the house with another person. On March 8, 2018, Lewis was indicted for the first-degree murder of

7

Bennett, the first-degree assault of Rozier, burglary, and the use of a firearm in the commission of a crime of violence.

With that arrest and consequent statement to the police and with the ensuing indictment, the once-cold case seemed to enjoy renewed vitality. On July 18, 2018, however, Lewis moved to have any mention of the false report of an identification of him by Rozier suppressed. He also moved to have his post-arrest statement to the police suppressed.

The trial schedule generally at that point was massively interrupted by the Covid-19 pandemic. There was also a significant delay caused by the fact that in the fall of 2018, Lewis himself suffered a brain aneurysm. For the rest of 2018 and for much of 2019, Lewis's recovery and the various examinations to determine if he was competent to stand trial kept the case from moving forward. His motion to suppress the false identification was finally denied on September 23, 2021. That entire suppression motion, its hearing, and its resolution actually sheds no light on the issue now before us on this appeal.

It was a year later, on July 13, 2022, that Lewis filed a renewed motion to suppress his false identification. That renewed motion to suppress triggered the extended hearing that finally took place on four hearing days on July 13 and July 21, 2022; and August 3 and 4, 2022. In mid-passage, that four days of hearing evolved from a hearing largely on the motion to suppress the false identification into a hearing largely on a motion to suppress the post-arrest statement Lewis had given to the police in 2018.

**The Sole Issue Before Us:**
**Judge Anderson's Ruling Of August 4, 2022**

Over the course of four hearing days – on July 13, July 21, August 3, and August 4 of 2022 – Judge Anderson received evidence and argument on the appellee's Motion to Suppress an Identification and on his Motion to Suppress His Post-Arrest Statement. The appellee had been arrested on January 17, 2018 on the basis of a Statement of Charges against him that had been issued on December 28, 2017. On August 4, 2022, Judge Anderson gave her rulings on both motions from the bench.

Judge Anderson ruled that the application for the Statement of Charges had failed to establish probable cause to justify the Statement of Charges and that the subsequent arrest of the appellee had, therefore, been unconstitutional. On that basis, she ruled that the appellee's post-arrest statement would be suppressed. The current appeal by the State of that suppression ruling was filed on August 11, 2022. On December 8, 2022, pursuant to the request of both parties, Judge Anderson filed a formal Opinion and Order memorializing her ruling from the bench on August 4, 2022. We will look first at Judge Anderson's ruling from the bench on August 4 and her follow-up Opinion and Order in close and careful detail.

Over the course of the hearings, Judge Anderson had examined in minute detail the State's Application for the Statement of Charges that became the basis for the appellee's arrest. Before turning to the critical piece of new information, to wit, the false identification, Judge Anderson did take note of two items of earlier evidence from 2005 and 2008. They were 1) the description of the crime itself given by the surviving victim, Nathaniel Rozier, on February 16, 2005 and 2) the statement made by the jailhouse

9

informant, Raymond Darby, in March of 2008. Judge Anderson was fully aware of these two earlier pieces of evidence and she took them into consideration:

> [I]n this statement of charges they reference information here that was known to the officers in 2005. Based on the testimony that the Court received from the witnesses and the evidence that has been sent in by the State, the statements that were given by Mr. Darby in 2008, Mr. Rozier in 2005, that's State's Exhibit Number 1 and 2, what is contained in these statements is the same that is contained in this application for statement of charges.

(Emphasis supplied.) This belied the State's allegation that Judge Anderson refused to look at any evidence other than the statement about the false identification in the application for the Statement of Charges.

Judge Anderson then examined in close detail Detective Eckrich's reexamination of the victim Rozier on March 10, 2016 that led to Detective Eckrich's false report that Rozier had positively identified the appellee Lewis. Judge Anderson found that report, which was the only new information before her, to have been, indeed, absolutely false:

> So other than that, we then go to 2016. And in 2016, Detective Eckrich writes March 10th, 2016, "Meeting with victim Rozier at CID. Showed Rozier photo spread. Rozier identified photo number six – bottom right photo." And then the next line says, "Picture of Jermaine Lewis." Other than that, that's the only information we have.
>
> Detective Eckrich is the same officer who has sworn out this application for statement of charges indicating that on 3/10/16 a photo spread containing a picture of Jermaine Cordell Lewis was shown to victim Rozier. Victim Rozier positively identified Jermaine Cordell Lewis as one of the suspects that tied him up and killed victim Bennett.
>
> So that statement is false. On March 10th, 2016, there was no picture of Jermaine Lewis that was shown to victim Rozier. He is not in that photo spread. And in fact, the photo spread that Mr. Lewis was in, he was never positively identified by anyone. And it says victim Rozier positively identified Mr. Lewis, the Defendant, but indeed he never did.

10

(Emphasis supplied.)

In her Opinion and Order of the Court filed on December 8, 2022, Judge Anderson elaborated a bit more fully on her ruling from the bench on August 4, 2022:

> There has been no evidence introduced that Mr. Rozier ever named the Defendant or selected his photo on a different date, yet the Application for the Statement of Charges specifically relies on his identification. In fact it is the only new information included in the application sworn out in 2017. But for that added detail about an identification by Mr. Rozier, presumably in 2016, according to Detective Eckrich's notes, there is no additional evidence or probable cause to effectuate an arrest warrant upon the Defendant. The other evidence listed in the Application is the same evidence that existed in 2005 and 2008.

(Internal citation omitted.) (Emphasis supplied.)

In deciding that there was no probable cause to justify the appellee's January 17, 2018 arrest, Judge Anderson clearly did not confine herself to the evidence about the false identification and ignore all other evidence, despite the State's present claim to the contrary. She expressly acknowledged that other evidence outside the false identification might theoretically have established probable cause for a warrantless arrest. Notwithstanding that theoretical possibility, Judge Anderson found that there was no such other evidence:

> As stated previously, the probable cause in this case was only established through the information provided by Detective Eckrich who stated that the Defendant was identified in a photo array. The probable cause was based on something that never occurred as there is no evidence of an identification of the Defendant…Had probable cause been established through other evidence then that may have overcome the illegal seizure; however, in this matter, there is no other probable cause.

(Emphasis supplied.)

11

Other than that false identification, there was nothing else in the application for the Statement of Charges that in any way established probable cause to support the appellee's arrest:

> When reading the Application for Statement of Charges as a whole, without the new identification information, the judicial officer would have only had the statement, "During the course of the investigation the Defendant, Jermaine Cordell Lewis, was developed as a suspect" with no other information as to how he was developed as a suspect and without any other evidence. This information alone would be insufficient probable cause for the judicial officer.
>
> The issue here is the arrest and the seizure of the Defendant. The arrest warrant was issued because of the false information contained within the application. There is nothing that is contained within the application that would rise to the level of probable cause and allow a judicial officer to swear out the arrest warrant, other than the newly added identification information.

(Internal citation omitted.) (Emphasis supplied.)

Judge Anderson added that other than the false identification in the application for the Statement of Charges, no other information had been forthcoming that could have supported a finding of probable cause:

> There is no indication that Detective Eckrich had any other probable cause to arrest Mr. Lewis other than the false identification.

(Emphasis supplied.)

## A Double-Barreled Ruling

Thus, Judge Anderson's ruling of August 4, 2022 was a double-barreled ruling. She ruled that the appellee's post-arrest statement to the police would be suppressed. It was her reason for the ruling that was double-barreled.

12

The appellee had been arrested on January 17, 2018 on the basis of an arrest warrant. That warrant was based on the Statement of Charges that Commissioner Redmond issued on December 28, 2017. That Statement of Charges and the consequent arrest warrant was unconstitutionally flawed because it was based exclusively on the false statement that the victim Rozier had positively identified the appellee. That statement was false. The warranted arrest was, therefore, unconstitutional.

The second part of that omnibus ruling was that, notwithstanding the fact that other evidence might independently establish probable cause for a warrantless arrest and overcome thereby such illegality, "**there is no other probable cause**." We repeat that final sentence of Judge Anderson's ruling:

> Had probable cause been established through other evidence then that may have overcome the illegal seizure; however, in this matter, **there is no other probable cause**.

(Emphasis supplied.)

It is the State's appeal from that August 4, 2022 pretrial ruling by Judge Anderson that the appellee's post-arrest statement to the police would be suppressed that is the sole issue now before us.

### Standard Of Appellate Review

In reviewing a trial judge's ruling to suppress or not to suppress evidence, which is the only thing we are doing in this case, the controlling standard of appellate review was clearly and definitively set out by our Supreme Court speaking through Judge (later Chief Judge) Barbera in Gonzalez v. State, 429 Md. 632, 647, 57 A.3d 484 (2012):

13

> When reviewing the denial of a motion to suppress evidence <u>we confine ourselves to what occurred at the suppression hearing</u>. <u>We view the evidence</u> and inferences that may be reasonably drawn therefrom <u>in a light most favorable to the prevailing party on the motion</u>, here, the State.

(Emphasis supplied.) (Internal quotation marks omitted.) *See also* <u>Lee v. State</u>, 418 Md. 136, 148, 12 A.3d 1238 (2011) ("In undertaking our review of the suppression court's ruling <u>we confine ourselves to what occurred at the suppression hearing</u>.") (Emphasis supplied.). That standard of appellate review is critically important to this case. *See also* <u>State v. Luckett</u>, 413 Md. 360, 375 n.3, 993 A.2d 25 (2010).

In conducting our review, our field of vision is thus tightly circumscribed. The item being searched for, of course, is "other evidence." The "other evidence" must be evidence other than the false evidence of a positive identification of the appellee that had been the sole basis for the erroneous issuance of the Statement of Charges. It must, moreover, be "other evidence" that could establish probable cause for the warrantless arrest of the appellee.

Our field of search for such "other evidence" is strictly confined to what occurred at the suppression hearing. The particular suppression hearing before us, moreover, is the four-day suppression hearing conducted by Judge Anderson on July 13, July 21, August 3, and August 4, 2022. We are, therefore, not knights errant ranging forth through a massive 17-year record in search of some long lost scrap of paper or passing tidbit. Our holy grail is far more parochial. We are not looking for "other evidence" in some cosmic or universal sense. Our field of search is confined within the four corners of the four-day hearing before Judge Anderson. For appellate review purposes, anything else does not exist.

14

With respect to any possible "other evidence" appearing at that four-day hearing, moreover, and, in case that evidence should turn out to be equivocal, the controlling standard of review also reminds us, that we must "view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion." In this case, of course, that prevailing party was the appellee, Jermaine Lewis. On any debatable evidence, therefore, the appellee will enjoy the benefit of every possible interpretive tilt. Far more often than not in appellate review, such an interpretive tilt will control the final outcome. It is measurably better to be the appellee.

One final lesson to be drawn from the controlling standard of appellate review is the deference the appellate court owes to the fact finding of the trial judge. As Judge Barbera very clearly stated in <u>Gonzalez v. State</u>, 429 Md. at 647-48:

> <u>We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous</u>. <u>The credibility of the witnesses</u>, <u>the weight to be given to the evidence</u>, and the reasonable inferences that may be drawn from the evidence <u>come within the province of the suppression court</u>.

(Emphasis supplied.) (Internal citations omitted.)

In <u>Longshore v. State</u>, 399 Md. 486, 499, 924 A.2d 1129 (2007), the Maryland Supreme Court spoke to the same effect:

> Making factual determinations, *i.e.* <u>resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder</u>. In performing this role, <u>the fact finder has the discretion to decide which evidence to credit and which to reject</u>.

(Emphasis supplied.) Credibility and weight!

15

In the course of our analysis of the single dying ember before us in this case, the story told to the Prince George's County Police in 2008 by the jailhouse informant Raymond Darby, the credibility/reliability of Darby, and the weight to be given the story told by him will be the dispositive factors. To the extent to which Judge Anderson made such findings or even gave discernible indications of her implicit leanings in those regards, we will be accordingly deferential. *See* <u>Longshore v. State</u>, 399 Md. 486, 499, 924 A.2d 1129 (2007) ("Making factual determinations, *i.e.* resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder."). To the extent to which our own inclination coincidentally corresponds with Judge Anderson's feelings, that will be mere reinforcing surplusage. In any event, the controlling standard of appellate review clearly marks out the boundaries of our review in this matter. We will stay within those foul lines. Comfortably.

## A Non-Contentious Contention

The State concedes that the arrest warrant, based as it was on the false claim of the appellee's identification by Rozier, was improperly issued. The arrest of the appellee on the basis of a bad warrant was consequently unconstitutional. The State stoutly maintains, however, that even if the warranted arrest had been improper, the police nonetheless had independent evidence sufficient to establish probable cause for a warrantless arrest and that that alternative justification for the appellee's seizure precluded the suppression of evidence.

The possibility for such an alternative justification is the heart of the State's appeal. Indeed, the United States Supreme Court cases of <u>Brown v. Illinois</u>, 422 U.S. 590, 95 S.Ct.

16

2254, 45 L.Ed.2d 416 (1975) and <u>United States v. Watson</u>, 423 U.S. 411, 965 S.Ct. 820, 46 L.Ed.2d 598 (1976) stand for just that proposition. This Court has squarely agreed with the proposition in <u>Faulkner v. State</u>, 156 Md. App. 615, 847 A.2d 1216 (2004). In <u>Faulkner</u>, an arrest warrant and the subsequent arrest were bad. Notwithstanding that fact, the police had adequate independent evidence to support a warrantless arrest. As Judge Adkins (later of the Supreme Court) wrote for this court:

> Faulkner primarily challenges the court's finding of probable cause by relying on the inadequacy of the warrant affidavit. But, <u>in contrast to the court's task in determining whether there was probable cause to issue the warrant</u>, <u>the court's task in determining whether there was probable cause to make an arrest can be accomplished with evidence outside that affidavit</u>.

156 Md. App. at 647. (Emphasis supplied.)

Even if an arrest based on a bad warrant would have been an unconstitutional seizure of the arrestee, other evidence outside of the warrant application may nonetheless be sufficient to justify a warrantless arrest:

> <u>In determining that the police had probable cause to arrest Faulkner, the circuit court was not confined to the meager information presented in support of the warrant application</u>. We agree with the circuit court that, <u>despite the "bare bones" nature of the warrant affidavit</u>, and uncertainties regarding the reliability of Jackson's story, <u>police had ample evidence to establish probable cause that Faulkner shot Powers</u>.

156 Md. App. at 648. (Emphasis supplied.)

Judge Raker (specially assigned) wrote for this Court to a similar effect in <u>McCormick v. State</u>, 211 Md. App. 261, 271, 65 A.3d 178 (2013):

> <u>[A]s long as the police could have stopped the driver for a traffic violation, it is inconsequential that the police actually stopped the driver to investigate another offense</u>. An officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.

17

The officer's legal justification for the arrest is not the *sine quo non* of probable cause – the officer's actions are not invalidated so long as the facts and circumstances viewed objectively, support the arrest.

(Internal citations omitted.) (Emphasis supplied.)

In Collins v. State, 17 Md. App. 376, 302 A.2d 693 (1973), the defendant was arrested and searched on the basis of an arrest warrant that the Court deemed to have been improperly issued. The resulting conviction was reversed. As Chief Judge Orth then explained, however, we remanded the case for a new trial because the State might on retrial be able to prove that notwithstanding the bad warrant, sufficient probable cause might have existed to establish probable cause for a warrantless arrest:

[W]e shall remand the case for a new trial. The State may be able to show that there existed probable cause for a warrantless arrest of Collins.

17 Md. App. at 384. (Emphasis supplied.) Chief Judge Orth further explained:

In other words, on retrial the State has the opportunity to prove the legality of the arrest of Collins without reliance on the warrant, and by so doing establish the reasonableness of the search and seizure by which the challenged evidence was secured. The legality of a warrantless arrest would be proved by showing that the police had facts and circumstances within their knowledge or reasonably trustworthy information thereof, sufficient to warrant a reasonably cautious man in believing that Collins had shot and killed Butler.

17 Md. App. at 384-85. (Emphasis supplied.) To go on with this legal analysis would be carrying coals to Newcastle because no one disagrees with it.

## But A Contentious Non-Contention

The heart of the State's appellate brief was dedicated to establishing and to reaffirming this legal proposition that even a bad warranted arrest will not require the exclusion of evidence if the police at the time had "other evidence" that could have justified

18

a warrantless arrest. We fully agree with the State as to that legal proposition itself. Nor does the appellee himself disagree with that legal proposition. Nor does Judge Anderson disagree with that legal proposition. Indeed, she affirmatively endorses it. By unanimous acclaim, the first round goes to the State. But **WHAT THEN?**

Judge Anderson and the appellee and this Court, all in unison, now ask the State with a single voice the single question, "Okay, but where do you go from there? You have persuaded us that you don't need a good identification by Rozier and a good warrant to prevail. You can win with 'other evidence' that establishes probable cause for the appellee's warrantless arrest. But where is that 'other evidence?' What is that 'other evidence?'" Here, indeed, is the precise tectonic fault line of the appeal.

The State's burden in this regard is not legal, but factual. The State may not, as an abstraction, simply point to a massive 17-year record and self-confidently announce, "Here it is. This is our 'other evidence.'" The State needs to be more specific with respect to "other evidence." It must, moreover, specifically point to where such "other evidence" was actually presented to the four-day suppression hearing. This is the contentious non-contention. The clash is factual, not legal.

For all intents and purposes, the State's brief made a sound legal argument about its general legal proposition and then it stopped, halfway through its mission. It prevailed in establishing its legal entitlement to rely on "other evidence" but it then failed to offer any "other evidence." Its development of its alternative theory that "other evidence" showed probable cause for a warrantless arrest received scant mention. The State's appellate brief is 37 pages long. A bare two pages, under the subheading "3. Probable cause existed for

19

Lewis's arrest," are devoted to this "other evidence." Full-half of those two pages deal with general statements of law. Two paragraphs are devoted to the jailhouse informant Raymond Darby and that is it. The second and longer of the two paragraphs is devoted to the proposition that the detail Darby provided about the circumstances of the crime itself – the actus reus – served as corroboration of Darby's statement. A statement about the information actually communicated by Darby consists only of one paragraph of seven lines. That is the sum total of the "other evidence" offered to support the alternative theory of probable cause for a warrantless arrest.

In her ruling from the bench on August 4, 2022, Judge Anderson reiterated on several occasions that she had, before turning to the issue of the false identification, looked at the initial report about the crime made by the victim Rozier in 2005 and also the information supplied by the jailhouse informant Darby in 2008. Thus, the State's claim that Judge Anderson erroneously declined to look at "other evidence" outside the four corners of the application for the Statement of Charges is simply not true. She definitely did look at evidence other than the false identification and she found that it was not sufficient to establish probable cause to arrest the appellee. Before ruling on the false identification, Judge Anderson clearly stated:

> [I]n this statement of charges they reference information here that was known to the officers in 2005. Based on the testimony that the Court received from the witnesses and the evidence that has been sent in by the State, the statements that were given by Mr. Darby in 2008, Mr. Rozier in 2005, that's State's Exhibit Number 1 and 2, what is contained in these statements is the same that is contained in this application for statement of charges.

(Emphasis supplied.)

20

In her Opinion and Order of the Court filed on December 8, 2022, Judge Anderson elaborated:

> But for that added detail, they are in the same situation they would have been in 2005 or 2008 without that detail, meaning that they did not have enough to arrest Mr. Lewis prior to that other than this positive identification that has been made or supposedly been made and was placed in the statement of charges.

(Emphasis supplied.) In order to rely on "other evidence," you need to supply such "other evidence."

## A Bad Faith Invocation Of The Good Faith Exception

Before proceeding with our extended analysis of the State's alternative theory of probable cause, however, we must dispose of the State's other argument that an alternative theory of probable cause was unnecessary. That argument is that, notwithstanding the fact that the warrant was bad, the suppression of the appellee's statement was still not required because the officers executing the warrant had acted in good faith reliance on the fact that a judge had issued the warrant.

We note a serious flaw in the State's effort to apply the Good Faith Exception of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) to this case. Leon's primary rationale is concerned with analyzing the purpose of the Exclusionary Rule of Evidence. In Connelly v. State, 322 Md. 719, 728, 589 A.2d 958 (1991), Chief Judge Murphy explained that the purpose of the Exclusionary Rule is to deter unreasonable police conduct:

> The Court emphasized that the exclusionary rule was designed to deter police misconduct rather than to punish the errors of judges and magistrates. It said that suppression of evidence obtained pursuant to a warrant should be

21

ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule. In this regard, the Court questioned whether the exclusionary rule has a deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.

(Emphasis supplied.)

## The Collective Knowledge Rule

When in a typical United States v. Leon case a judge makes a legal mistake in issuing a search and seizure warrant, the officer who then executes the warrant has had nothing to do with that mistake and has behaved reasonably in trusting the judge's judgment. Exclusion would serve no deterrent purpose. If, on the other hand, the police generally, through furnishing incorrect information or through a negligent investigation, had actually contributed to the erroneous issue of the warrant by the judge, the police may not then claim to have been acting in good faith.

In Ott v. State, 325 Md. 206, 600 A.2d 111 (1992), Judge Bell (later Chief Judge Bell) wrote for our Supreme Court in expounding detail about the Collective Knowledge Rule in cases involving the Good Faith Exception to the Exclusionary Rule. If the collective knowledge of the police generally, including police record keeping systems, would have revealed that a search warrant had been erroneously issued, such collective knowledge is imputed to the officer who executes the flawed warrant, whether the executing officer actually has such knowledge or not. As Judge Bell explained:

> Applying the collective knowledge rule, the Court of Special Appeals noted that 'the police department should have known that the stolen vehicle report was erroneous, since police officers had recovered the vehicle and tags originally reported stolen on January 10, 1969.' It concluded that, because the information on which the police acted was its own 'outdated copy of an

22

erroneous report of a stolen motor vehicle which the police had recovered on the same day it was taken,' the arresting officer, a part of the police team, 'must be charged with the knowledge that the report was, in effect, rescinded when members of the Baltimore City Police Department recovered the car shortly after it was stolen.'

325 Md. at 215-216. (Internal citations omitted.) (Emphasis supplied.) *See also* Carter v. State, 18 Md. App. 150, 154, 305 A.2d 856 (1973). The Supreme Court in Ott explained the earlier Carter decision:

This case thus stands for the proposition that police may not rely upon incorrect or incomplete information when they are at fault in permitting the records to remain uncorrected.

325 Md. at 216. (Emphasis supplied.)

Indeed, United States v. Leon itself, 468 U.S. at 923 n.24, had earlier pointed out:

It is necessary to consider the objective reasonableness not only of the officers who eventually executed the warrant, but also of the officers who originally obtained it or who provided information material to the probable cause determination.

(Emphasis supplied.) We look at the police team as a totality. That is what the Collective Knowledge Rule is all about.

In this case, of course, the arrest of the appellee was transparently unconstitutional. It was bad exclusively on the basis of the incorrect statement by Detective Eckrich that the victim Rozier had positively identified the appellee as one of his assailants. The police team in this case that arrested the appellee, therefore, was not free from blame for Commissioner Redmond's erroneous issuing of the Statement of Charges. The police were responsible for his error. Commissioner Redmond acted exclusively on the basis of the blatantly inaccurate sworn statement that the victim Rozier had positively identified the

23

appellee as one of his assailants. That statement was completely inaccurate and that mistake was directly attributable to the police.

In this case, moreover, we are not even dealing with police knowledge in a general sense. The police error that in and of itself caused the bad warrant to issue was made by the cold case unit of the Prince George's County Police Department specifically. The officers who arrested the appellee were also members of that same cold case unit of the Prince George's County Police Department. That unit specifically had reason to know that the application for a Statement of Charges was based on a false report. The police may not rely on the judge's mistake when the police are responsible for the judge's mistake. The police reliance on the warrant in this case, therefore, was not reasonable. In no way could the Good Faith Exception to the Exclusionary Rule have applied in this case. It did not.

### The Darby Fragment

For all intents and purposes, that would be enough to resolve the only issue before us and to affirm the granting of the motion to suppress. Because the State has made, however, such a heroic, indeed a Mary Shelleyesque, effort to breathe some life into this lifeless cause, we feel constrained to give the State the benefit of our own assessment as well of the Darby fragment, the only "other evidence" that the State can muster. The Rozier statement to the police in 2005, of course, went only to the actus reus of the crime and not to the criminal agency of the appellee. As the only "other evidence" offered to justify a warrantless arrest of the appellee on January 17, 2018, the Darby fragment is the exclusive specimen under our appellate microscope. We are dealing with the Darby fragment and with nothing else. There is nothing else.

24

**Credibility And Reliability**

For the information from Raymond Darby, to wit, the Darby fragment, to establish probable cause, the source of the information, Darby himself, must be credible and the information from him must be reliable. Who was Raymond Darby? What were the circumstances of his furnishing information to the police? We ask those questions with a consciously jaundiced eye. As Chief Judge Murphy said for the Maryland Supreme Court in <u>State v. Lee</u>, 330 Md. 320, 327, 624 A.2d 492 (1993):

> <u>[T]he veracity and basis of knowledge of the informant clearly remain relevant to a probable cause determination</u>.

(Emphasis suppled.)

**A. Darby Was A Jailhouse Informant**

Raymond Darby was a jailhouse informant. He had information to trade. He was obviously not a concerned citizen immediately calling in information about a crime. Darby ostensibly heard the inculpatory admission that he ultimately reported within several hours of the commission of the crime in February of 2005. He did not deliver that information to the police, however, until March 26, 2008, over three years later. That would have been a very slow response for a Neighborhood Crime Stopper. Neighborhood Crime Stoppers, moreover, do not "trade" their information to the police. That delay factor alone, not to mention the trade factor, makes Darby's credibility initially suspect.

The circumstances in March of 2008 were that Darby was in a federal detention facility in Virginia. He sent word to the Prince George's County police that he had information to trade. From this massive 17-year record, incidentally, we have not been able

25

to discern what break or advantage, if any, Darby received in exchange for turning over the names of the appellee Lewis and Forte. The State, which would be privy to such information, has elected not to broadcast it. Why Darby talked, however, would obviously be a very relevant factor in deciding whether he told the truth. This entire circumstance tends to diminish the reliability of the information. We begin by viewing the Darby fragment cum grano salis.

**B. Darby May Well Have Been An Accomplice**

Another factor derogating from credibility/reliability is that Darby may well have been an actual participant in the crime. The victim Rozier's corrected account of the crime in 2016 describes three participants in the crime, not two. Darby, by his own admission, was present with Lewis and Forte within an hour or two of the crime's commission. Lewis and Forte were discussing the crime with him in lucid detail. Why would they acknowledge their criminal involvement to an uninvolved third person? It makes sense that a criminal might talk freely about a crime to a fellow criminal. It makes far less sense that a criminal, several hours after the crime occurred, would talk freely about the crime to an uninvolved third person. The circumstances of the conversation may tell us as much as does the narrative recounted in the conversation.

The Prince George's County Police Department obviously believed that Darby may have been involved in the crime. When they reinterviewed the victim Rozier in 2008, they presented him with photo arrays that included not only pictures of Lewis and Forte, but also a picture of Darby. When DNA samples were sent to the crime lab for examination, the police sent samples not only of Lewis and Forte, but also a DNA sample from Darby.

26

There was clear suspicion that Darby may well have been an accomplice. Neighborhood Crime Stoppers are generally not treated that way.

On the issue of independent evidence of probable cause, the ultimate issue before the four-day suppression hearing, it was Judge Anderson who was charged with assessing the credibility of any source of information on the subject. Her assessment of Darby as a likely criminal accomplice obviously weighed heavily in her assessment of the credibility of Darby. An exchange between Judge Anderson and the State at the second day of the hearing on July 21, 2022, is revealing:

> THE COURT: Okay. So, that's new information. So, <u>if Mr. Darby is also possibly a suspect and the probable cause is based on the statement of a suspect and there is nothing else</u>, because Mr. Rozier did not identify the defendant. So, <u>if Darby is the star witness and Darby is also a suspect that's problematic</u>.

(Emphasis supplied.) That exchange continued:

> [THE COURT:] So, really, <u>we're stuck with Darby</u>…[O]n April 8th Mr. <u>Darby is also being shown in a photo array</u>, separate and apart so it wasn't as if he was in – they just added his picture to Mr. Lewis' photo array or adding his picture to Mr. Forte's. <u>He's in his own photo array</u>. So, <u>if he is witness he would not have been put in a photo array by himself</u>. Then, <u>there is nothing else you're relying on other than a co-defendant's statement</u>.

(Emphasis supplied.) Judge Anderson clearly looked upon Darby as a "co-defendant."

Our devaluation of the efficacy of the dying ember before us, to wit, the story told by Raymond Darby to Detective Barba in 2008, to establish, without more, probable cause to arrest the appellant is, to be sure, based in part on analogizing it to the uncorroborated courtroom testimony of an accomplice, a similar devaluation. The insufficiency of the uncorroborated testimony of an accomplice in court to support a conviction and the relative

27

unsubstantiality of an uncorroborated story told to the police by a jailhouse informant are, to be sure, distinct legal phenomena. The bar of admissibility for trial testimony is, of course, much higher. The respective devaluations, however, may nonetheless be readily analogized to one another because they share a common denominator raison d'etre. That common denominator raison d'etre is the devalued credibility and consequently the diminished reliability of the accomplice himself, in whatever guise or forum he appears.

## C. Darby's Memory Was Suspiciously Precise

Another factor in assessing Darby's credibility was the laser-like precision of his ostensible memory. In describing every step that the criminals took at the crime scene and the precise location in the house where each step was taken, Darby's description coincided precisely with every detail that the victim Rozier had described at the time of the crime. Darby was a human camera. Is such remarkable precision likely in one merely recollecting a conversation one heard over three years before or is this more likely memory by one who was present at and participated in the crime? We must remember, moreover, that we are required to look at that version of the facts and all inferences that may reasonably be drawn therefrom in the light most favorable to the appellee.

Was the Darby fragment, therefore, an uncorroborated story by a likely accomplice? At the very mention of the word "corroboration," the State leaps enthusiastically to the barricades to remind us that Darby's account of the crime was corroborated precisely and in great detail by the victim Rozier's account. The State neglects, however, the subtle distinction between general corroboration and specific corroboration. On the issue of whether the police had probable cause for the appellee's warrantless arrest, the critical

28

information that was needed was not information about the crime scene generally, but information about the appellee's criminal agency specifically. Darby's information about the appellee's criminal agency specifically was not corroborated by Rozier. Once again, we must remind ourselves that we are enjoined to look at that version of the facts and all inferences that may be reasonably drawn therefrom in the light most favorable to the appellee. Does that not include Darby's status as a likely accomplice and that status's consequential impact on his story's reliability?

### D. A Recollection Of A Recollection: Attenuation Per Se

The trajectory of the information from the jailhouse informant to the suppression hearing court was also perilously attenuated. During the entire four-day hearing, only a single witness was called. On August 3, 2022, the third day of the hearing, the State called former Detective (retired Lieutenant) Matthew Barba. It was Detective Barba who had been sent to Virginia to interview Darby on March 26, 2008.

Throughout his testimony, Detective Barba was straining to recollect his interview with Darby fourteen years before. In trying to follow the trail back to the trailhead, moreover, our ultimate destination is not Detective Barba's interview with Darby in 2008. At that interview, Darby, in turn, was ostensibly trying to recollect the conversation he had overheard three years earlier. The only information at the suppression hearing bearing on the Darby fragment, therefore, was a recollection of a recollection attenuated out over seventeen years. That's getting perilously thin.

**E. The Police Did Not Credit The Darby Fragment**

The Prince George's County Police Department had the Darby fragment in hand as of March of 2008. When the reinterview of Rozier in 2008 proved fruitless as far as the appellee Lewis was concerned, the Darby fragment was still available. Although the State now argues fervently before us that that Darby fragment, standing alone, constituted probable cause for the appellee's arrest, the Prince George's County Police never arrested him in 2008. Instead, the police let the case go completely cold for the next eight years, notwithstanding what they now claim was probable cause for the appellee's arrest. In the meantime, the police put a picture of Darby in a photo array and sent a sample of his DNA to the crime lab for analysis. Indeed, when the investigation reopened in 2016, it was not on the basis of the Darby fragment. Indeed, the application for a Statement of Charges in 2017 did not so much as mention the Darby fragment.

In the written affidavit he submitted to the four-day suppression hearing in July and August of 2022,[2] Detective Eckrich explained that he deliberately omitted any mention of Darby in his application for a Statement of Charges out of a concern for Darby's security, to protect him from possible retaliation. The police never arrested the appellee on the basis of the Darby fragment. As is self-evident from their conduct, the Prince George's County Police Department never treated Darby as credible and never treated his information as reliable. That appraisal of Darby on their part is a telling factor that simply cannot be callously ignored. Their interpretive tilt unquestionably influences our interpretive tilt.

---

[2] As of the summer of 2022, Detective Eckrich had left the Prince George's County Police Department and he did not appear as a witness at the suppression hearing.

**F. Judge Anderson Did Not Credit The Darby Fragment**

In making her suppression ruling on August 4, 2022, Judge Anderson on several occasions pointed out that the Darby fragment was the only "other evidence" the State had to establish probable cause for a warrantless arrest of the appellee. She expressly ruled that that evidence did not establish probable cause. Implicit in her ruling to suppress the appellee's statement was her implicit conclusion that Darby was not credible and that his information was not reliable. This is a critical factor that cannot be casually ignored. Indeed, it is an interpretive factor to which we actually owe deference.

Each of these six factors is relevant, of course, on the issues of the credibility of Darby and the reliability of his information. With respect to each of these factors individually the controlling standard of review requires that all evidence and all inferences that may reasonably be drawn therefrom must be viewed in the light most favorable to the appellee. That interpretive tilt applies to each of the six factors individually and then to the totality of the factors collectively. That does not leave much room for the State to wriggle. Darby was obviously something less than an exemplar of integrity. In its totality, the Darby fragment was a kaleidoscope of unreliability.[3]

**The Inculpatory Significance Of The Darby Fragment:
The Intractable Ambiguity Of The Pronoun "They"**

---

[3]   We have not mentioned as a possible seventh credibility/reliability factor that Darby, as of 2008, obviously had some record of past criminal behavior. In this case, no one ever bothered to explore the possible dimensions of his criminal record. Apparently everyone deemed it to be mere surplusage. Darby's credibility was shaky even without a rap sheet.

Our anatomy of this dying ember, however, does not end here. Quite aside from any issue about Darby's credibility or about his story's reliability, there is a further problem with the Darby fragment's substantive weight as inculpatory evidence. What was its actual value as proof of the appellee's guilt? Even if the conversation several hours after the commission of the crime on February 16, 2005 had taken place exactly as Darby reported it three years later, what, if anything, was its precise value as evidence of the appellee's guilt? Not somebody's guilt? Not the pair's collective guilt? Not **THEIR** guilt, but **HIS** guilt?

Had Darby ultimately been offered as a witness, he could not have testified as to what happened at the crime scene. According to his own version of events, he had not been there. He could only repeat what someone else had told him about the crime scene. That, of course, would be inadmissible hearsay. What Darby could relate, on the other hand, might be an admission of guilt by a hearsay declarant. Darby would have heard that admission with his own ears and it would be admissible as a recognized hearsay exception. The critical question, of course, would then become, "An admission of guilt **BY WHOM**?"

Throughout this case, the universally accepted version of the Darby fragment seems to have been that shortly after the commission of the crime, Darby engaged in a conversation with Anthony Forte and the appellee Jermaine Lewis and that, after a detailed recitation of the criminal acts, "**THEY** acknowledged **THEIR** involvement." As the only witness to testify at the four-day suppression hearing, Detective Barba summarized his recollection of what Darby had said to him on March 26, 2008:

32

Summarization of what he provided in both verbal and a written statement was that <u>Mr. Forte and Mr. Lewis were involved in a home invasion</u> that occurred in 2005 that ended up being a homicide. <u>And **THEY** gave him direct details of what happened during that homicide</u>, and Mr. Darby ended up relaying that information in detail to us.

(Emphasis supplied.)

That brings the Darby fragment into head to head confrontation with the inherently intractable ambiguity of the pronoun "**THEY**." Who exactly are "**THEY**?" "**THEY,**" of course, may denote swarming multitudes, as in "Under Attila, '**THEY**' overran much of central Europe." "**THEY**" may also be a sedate and elderly couple, as in "'**THEY**' are the focus of Grant Woods's <u>American Gothic</u>." In either manifestation "**THEY**" retains its illusive ambiguity.

As the quantitative content of "**THEY**" diminishes, of course, the degree of ambiguity correspondingly diminishes, but some ambiguity still abides. To be one of ten thousand is obviously ambiguous. To be one of two, however, is also ambiguous. To be one of "**THEY**" is by definition ambiguous, whatever the quantitative content of "**THEY**" may be. That ambiguity is only resolved at the point where diminishing plurality finally collapses into singularity, at the point where "**THEY**" becomes "**HE**." On the basis of what was produced before the four-day suppression hearing, that point was never reached. Darby told the police what "**THEY**" said. He never told the police what "**HE**" said. Unlike in Horseshoes, coming close does not count.

We thus do not know with any certainty what words, if any, the appellee himself ever actually spoke to Raymond Darby on February 16, 2005. We do not know with any certainty whether the appellee Lewis ever actually admitted his guilt to Darby. The appellee

33

Lewis may simply have been standing there as Forte did all, or most, of the talking. The Darby fragment, even if reliable, was not, therefore, substantive evidence of the appellee's involvement in the crime. It lacked substantive weight. For an admission of guilty involvement to qualify as cognizable proof of guilt, the authorship of the damaging admission needs to be established with particularity. The law does not recognize a declaration against interest by a Greek chorus. **THEIR** admission of guilty involvement is not enough. It must be **HIS** admission of guilty involvement. We have failed to find such particularity anywhere in the Darby fragment.

## Where Are We?

Across a span of seventeen years and through the fog-like mist of seventeen years, it is difficult to focus clearly on the precise argument the State is making. As a constitutional alternative theory to a bad arrest on a bad warrant, did the police on January 17, 2018 actually have independent probable cause for a warrantless arrest of the appellee? That depended exclusively on a declaration against interest allegedly, but not necessarily, made by the appellee on February 16, 2005. The source of that damaging allegation was a jailhouse informant in August of 2008 who reported that he had heard someone make such a declaration in 2005. For a combination of reasons, the suppression hearing judge considered that jailhouse informant to be non-credible and his allegations to be accordingly unreliable.

That information from the jailhouse informant in 2008 is unquestionably the sole basis on which the State now urges us to hold de novo that the police had probable cause for a warrantless arrest of the appellee on January 17, 2018 and accordingly to reverse

Judge Anderson's ruling to the contrary. Judge Anderson's clear feelings about the jailhouse informant's lack of credibility and about his information's lack of inculpatory weight, while arguably debatable, were certainly not clearly erroneous. Can the State seriously argue otherwise? We are required, therefore, to be deferential. Accordingly, we affirm Judge Anderson's ruling.

Even if we were not so inclined (such is not the case), our de novo determination of the ultimate legal question (the existence of probable cause) would be subject to that same tilt as to credibility and that same tilt as to inculpatory weight. On the basis, therefore, of the lack of credibility in Raymond Darby and the lack of significant inculpatory weight in his 2008 information to the police, our de novo constitutional judgment would also be that there was no independent evidence to establish probable cause for the warrantless arrest of the appellee on January 17, 2018. There was thus no spark of life remaining in this separate dead ember, if ever there had been. The cold case remains inertly cold. If we were deciding the probable cause issue de novo, we would also affirm Judge Anderson's ruling to suppress the appellee's post-arrest statement.

### A Dead Ember

This is an icily cold case. For fourteen years, the Prince George's County Police Department did not deem the Darby fragment, standing alone, to be actionable probable cause. Accordingly, it did not act. At the suppression hearing in July and August of 2022, Judge Anderson did not deem the Darby fragment, standing alone, to be constitutionally rehabilitative probable cause. Accordingly, she did not uphold the arrest. On appellate review, this Court would not de novo deem the Darby fragment, standing alone, to be

35

actionable probable cause. Might this ancient ember, therefore, ever rekindle a resuscitative spark in this long forgotten chapter of investigative lore? Holdeth our panel, "**NEVERMORE.**"

**SUPPRESSION RULING OF AUGUST 4, 2022 AFFIRMED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**